## ANDERSON v. MESSINGER.

### (Circuit Court of Appeals, Sixth Circuit. June 5, 1906.)

### No. 1,479.

1. TRIAL—FINDINGS—CONSTRUCTION.

Where the facts material to the judgment were agreed on, a recital that the court finds the issues of the case with the defendant should be construed to refer to the issues of law.

2. SAME.

Where the facts are agreed on, they are the equivalent of facts found by the court.

[Ed. Note.—For cases in point, see vol. 46, Cent. Dig. Trial, § 880.]

3. MORTGAGES—ASSIGNMENT—FORECLOSURE.

Where a mortgagee assigned the mortgage with other property as collateral for debt owing by the mortgagee, and the assignee thereafter caused the mortgage to be foreclosed and purchased the property at a sale under a foreclosure decree, he held the mortgagor's title, in the absence of agreement to the contrary, for his own benefit, and not as trustee for the assignor.

[Ed. Note.—For cases in point, see vol. 35, Cent. Dig. Mortgages, §§ 605, 1552–1556.]

4. JUDICIAL SALES—WHO MAY PURCHASE—PURCHASE BY PLEDGEE.

The rule that a pledgee who is a trustee cannot become the purchaser at his own sale of the pledge is inapplicable to a judicial sale conducted by an officer of the law.

[Ed. Note.—For cases in point, see vol. 31, Cent. Dig. Judicial Sales. § 40.]

5. WILLS—CONSTRUCTION—REMAINDERS.

Testator declared that if either of his two sons died without lineal descendants, the survivor should take his estate, and if the survivor died without lineal descendants, then one-half both of the decedent's original portion as well as one-half of the portion taken by survivorship should go to testator's brother P., and the other half to such of testator's brothers and sisters as might be living at the time of the death of the surviving son. Held, that the sons thereby acquired a life estate in a moiety of the property with a remainder to the survivor of the one first dying, in the event he died without lineal descendants, the survivor then taking a life estate in both moieties, with remainder to his lineal descendants living at his death, otherwise to testator's collateral relatives.

[Ed. Note.—For cases in point, see vol. 49, Cent. Dig. Wills, §§ 1440–1444.]

6. TRUSTS—DURATION—LIMITATION.

Where testator directed that his trustees should deliver a settlement of their trust to each of his two sons on their reaching the age of 21 years, respectively, and then put them in possession of one-half of the property, except that there might be a reservation of a fraction of the moiety until the sons should, respectively, arrive at the age of 25 years, when the remaining part should be delivered to them, the trustees' authority as such expired by limitation on the arrival of the youngest son at 25 years of age.

[Ed. Note.—For cases in point, see vol. 47, Cent. Dig. Trusts, § 82.]

7. EXECUTORS—SALE OF LAND—AUTHORITY—PROBATE ORDER.

Executors not expressly authorized by the will cannot convey lands to pay debts except under the authority of an order of the probate court entered after notice to the parties interested.

[Ed. Note.—For cases in point, see vol. 22, Cent. Dig. Executors and Administrators, §§ 533–536, 558.]

146 F.—59

8. TRUSTS—TRUSTEES—DEEDS.

　　Deeds by testamentary trustees, not delivered until after their author·
ity as trustees had expired by limitation, were void.

9. LIFE ESTATES—LIFE TENANTS—CONVEYANCE IN TRUST—REMAINDERMEN.

　　Where, by testator's will, an estate in remainder after the death of
his surviving son was given to his lineal descendants, it was beyond the
power of the tenants for life to defeat or prejudice the remaindermen by
an attempted declaration of trust of the property.

In Error to the Circuit Court of the United States for the Northern District of Ohio.

R. P. Carey and C. H. Trimble, for plaintiff in error.

C. W. Everett and H. E. King, for defendant in error.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

SEVERENS, Circuit Judge. This is an action of ejectment brought by Anderson, the plaintiff in error, to recover the possession of certain lots in the city of Toledo, Ohio, described in his petition, of which he claims the legal title, and the possession of which, he says, is wrongfully withheld by the defendant. The answer denies the alleged title of the plaintiff, and denies the plaintiff's right to the possession. A stipulation was filed waiving a trial by jury, and consenting to a trial by the court. Upon the trial, proof of all the material facts was made by mutual stipulations which are incorporated in the bill of exceptions. The court rendered judgment for the defendant, the entry reciting that the court "does find the issues of the cause with the defendant." As the facts material to the judgment were agreed, this must mean that the court found the issues of law for the defendant. Supervisors v. Kennicott, 103 U. S. 554, 26 L. Ed. 486; Hulitt v. Ohio Valley Nat. Bank, 137 Fed. 461, 465, 69 C. C. A. 609. When the facts are agreed, they are the equivalent of facts found by the court, and the question of the propriety of the judgment is, in each case, the same. Supervisors v. Kennicott, 103 U. S. 554, 26 L. Ed. 486; Lehnen v. Dickson, 148 U. S. 71, 13 Sup. Ct. 481, 37 L. Ed. 373; St. Louis v. Telegraph Co., 148 U. S. 92, 13 Sup. Ct. 485, 37 L. Ed. 380. Some other matters hereafter to be referred to were received in evidence over objections which were incompetent to disturb or affect the ultimate material facts, and could not, therefore, affect the judgment. The case is properly here for review to determine whether the judgment is the one which the facts agreed required.

　　Each of the parties derives his title from Edward Bissell, a former resident of Toledo. On May 19, 1838, Bissell, claiming to be the owner of the premises, gave his bond to Charles Butler of New York for the sum of $21,500, payable one year from that date, with interest at 7 per cent., and to secure the payment thereof, gave, with his wife, to said Butler, a mortgage on the premises in question. This bond and the mortgage were assigned by Butler on September 23, 1841, to Henry Anderson, a resident of Holly Springs, Miss., to secure the payment of his note to Anderson for the sum of $20,000 and interest thereon; and for further security Butler assigned to said Anderson 546 shares of the Erie and Kalamazoo Railroad Company of the par

value of $50 per share. Butler having defaulted in the payment of his note, Anderson, on September 19, 1843, filed his bill in chancery in the court of common pleas for Lucas county, Ohio, to foreclose the Bissell mortgage, making Bissell and his wife, Butler and other parties, defendants. These parties other than Butler were served with process. Butler was not served and did not appear. That suit was pursued to a decree which was rendered April 1, 1844, for the sum of $29,139.01. A sale was ordered and a master appointed to conduct it. The mortgaged lands were bid off by Henry Anderson at the price of $6,910. The sale was duly confirmed and the master was ordered to make the proper deed to the purchaser. At this stage of the proceedings and on October 4, 1844, an agreement was entered into between Butler and Anderson, which, after reciting the giving of the bond and mortgage by Bissell, the assignment thereof by Butler to Anderson and the assignment of the 546 shares of railroad stock to secure Butler's note, and the above-stated proceedings for the foreclosure of the mortgage, proceeded as follows:

"And, whereas, the said Henry Anderson at the instance and request of the said Charles Butler and in consideration of the covenant of the said Charles Butler hereinafter contained, is willing to relinquish and surrender to the said Charles Butler, the collateral securities, so assigned as aforesaid, for the payment of said note of twenty thousand dollars, so far as the same may be done without prejudice or injury to the order obtained for the sale of the said mortgaged premises, and the rights of the said Henry Anderson under the same, and without prejudice to the personal liability of the said Charles Butler, to the said Henry Anderson on the principal debt.

"Now, therefore, these presents witness, that in consideration of the premises and for the purpose of giving effect to the same, and said Henry Anderson has on the day of the date hereof executed and delivered a power of attorney to the said Charles Butler, empowering and authorizing him fully and effectually, if he shall see fit to do so, to release and discharge the said Edward Bissell of and from all personal claim, demand or liability, whatsoever for or on account of the said bond and mortgage, but without prejudice to the proceedings, which have been or may be adopted, to effect the sale of the said mortgaged premises, and that the said Henry Anderson has also by instrument in writing released and transferred to the said Charles Butler the said five hundred and forty-six shares of Erie & Kalamazoo Railroad Company stock.

"And the said Charles Butler, in consideration of the surrender and relinquishment of the securities, hereby covenants and agrees to and with the said Henry Anderson, that the same shall not be held or construed in any way to affect or impair the liability of him the said Butler on the said note for twenty thousand dollars, and the said Charles Butler also covenants and agrees to and with said Henry Anderson that he, the said Butler, will well and faithfully apply and pay over to the said Henry Anderson, on account of the said note, all sums of money or other valuable consideration which he, the said Butler, may receive or derive, by reason of the surrender and relinquishment of the securities aforesaid, by him the said Henry Anderson.

"In testimony whereof the said Henry Anderson and Charles Butler have hereunto respectively set their hands and seals in duplicate this fourth day of October in the year one thousand eight hundred and forty-four.

"[Signed]                  Henry Anderson.
"Charles Butler."

Thereafter, on November 18, 1844, the master in pursuance of the above-mentioned decree and of the sale and the order of confirmation

thereof, executed and delivered his deed of conveyance to Anderson, his heirs and assigns of the premises here in question, and which, as above stated, had been bid off by him. Prior to the date of this last-mentioned agreement between Butler and Anderson, Butler had, on February 22, 1843, obtained a quitclaim deed of these premises from Bissell and wife. But this deed was not recorded until after Anderson's death, nor until October 13, 1849, and it does not appear that the latter ever had notice of it. After the contract of October 4, 1844, Butler made no further payment on his debt to Anderson during the lifetime of the latter, nor to his representatives until October, 1849.

The first question in the case is what, as the consequence of these proceedings for foreclosure, the sale of the property to Henry Anderson under the decree, and the agreement of October 4, 1844 between him and Butler, was the nature of the title conveyed to Anderson by the master's deed. The contention for the plaintiff is that it conveyed to him the title to the property freed from the incumbrance of the mortgage, and that the price which he paid was properly applicable to the payment pro tanto of Butler's note. For the defendant it is contended that Anderson being assignee of the mortgage and having bid off the property and taken the master's deed to himself, acquired only Bissell's equity of redemption and held the property thereafter as trustee for Butler and as a continuing security for the payment of the latter's note. It is a well-settled rule of law that when the owner of securities pledges them to secure the payment of his own debt, he impliedly transfers the right to the remedies which will make the securities available for the payment of his debt in case of his own default. Schlieman v. Bowlin, 36 Minn. 198, 30 N. W. 879; Slee v. Manhattan Co., 1 Paige (N. Y.) 48, 78. And there necessarily goes with this power to make the securities available, the incidental power to transfer the assignor's interest in the securities; otherwise the purchaser does not get the property pledged by the securities, but an indefinite interest depending on contingencies over which he has a remote, if any, control, a circumstance which would greatly depreciate the value of the pledge.

There is also another rule of general application which is that a pledgee, who is a trustee, cannot become the purchaser at his own sale of the pledge. But this rule is not applicable to a judicial sale conducted by an officer appointed by law. Nor indeed is such a purchase absolutely void in all circumstances when the sale is a private sale and the purchaser has an interest to protect. In either of the last-stated instances, the sale would be voidable if the purchaser were guilty of any fraud or other wrongful practice in the transaction; in the first instance by a refusal of the court to confirm the sale or by some judicial proceeding to impeach it, and in the latter instance by such appropriate action private or judicial as he should elect to make his objection effective. Richards v. Holmes, 18 How. 143, 15 L. Ed. 304; Smith v. Black, 115 U. S. 308, 6 Sup. Ct. 50, 29 L. Ed. 398; Allen v. Gillette, 127 U. S. 589, 8 Sup. Ct. 1331, 32 L. Ed. 271; Pewabic Mining Co. v. Mason, 145 U. S. 349, 12 Sup. Ct. 887, 36 L. Ed. 732.

In Richards **v.** Holmes, supra, a deed of trust had been given to secure the payment of a note, which, at the time of the sale under the trust, was held by Harper. The latter authorized the auctioneer to make a bid for him, and that being the best price offered, the property was struck off to him. Upon a bill filed by a subsequent incumbrancer to redeem, it was contended that the sale under the trust deed was void upon the ground that the beneficiary of the trust could not bid at the trustee's sale, and that the first mortgage continued subject to redemption. But the court by Mr. Justice Curtis, observing that no fraud appeared, said:

"It was for the advantage of these complainants, as subsequent incumbrancers, that this property should sell for the best price which could be obtained. Even improper practices to enhance the price, if any such had been resorted to, could not be complained of by them. It is only some practice to prevent bidding, or procure a sale for less than the property would have otherwise brought, which can be relied on by them to avoid the sale. We have no doubt the creditor, for the satisfaction of whose debt the sale was made, had a right to compete fairly at the sale; but whether he had or not, his doing so could not be injurious to the complainants."

It would have made no difference in that case if the bid had been in the trustee's name, for his act would have enured to his cestui que trust who was the real party. And the learned justice further said:

"And the same remark applies to the trustee. It was his duty to obtain for the property the best price he could by the use of due diligence in a fair sale. It would have been improper for him, in behalf of the creditor, to employ the auctioneer to buy at anything short of that best price. But there was no impropriety in his employing him to bid a particular sum for the creditor, to prevent a sacrifice of the property."

But in any such case, the pledgor may, if he chooses, affirm the sale, and if he does, the ground of objection is removed. Glidden **v.** Mechanics' Bank, 53 Ohio St. 588, 42 N. E. 995, 43 L. R. A. 737.

If, in the present case, the property had been sold to another party, there could be no doubt that the sale and deed would have carried to the purchaser the title which the mortgagor, Bissell, had when he made the mortgage, and would have transferred any interest which Butler had in the property to the proceeds of the sale. The trust would attach to them. And to the extent of the sum due on Butler's debt they would be a satisfaction of it. If there were a surplus it would belong to Butler. Nor could it make any difference that Anderson bid off the property. The result would be the same. If he paid to the master the amount of his bid, it would be paid back to him on its being brought into court, a formality generally dispensed with by the master's taking the receipt of the creditor for so much of the proceeds as the decree adjudges to be due to him and bringing the balance into court to be paid over to the party entitled. If as here the party who might be so entitled was beyond the process of the court, he could come in by petition and on showing his right, obtain it. Butler, the assignor, was not served with process. He was a proper, but not an indispensable, party, and he was not within the jurisdiction of the court. The object in making him a party would be to enable him to make any objections which his interest might require and to

preclude him from thereafter raising any. But his agreement shows that the debt remained unpaid, and that, knowing the proceedings were pending and without suggesting any objection to them, he stipulated for their completion. The reasons on which a party in interest is allowed to purchase at a judicial sale whereby he must become answerable for his bid, are inconsistent with the notion that the proceedings have resulted in nothing more than a continuance of the trust for the same whole debt. We think the legitimate result of the foreclosure proceedings was to transfer the trust to the proceeds of the sale; for by assigning the Bissell debt and mortgage, Butler must have contemplated that the consequence must be that upon his default this transmutation of his interest by foreclosure of the mortgage and the sale of the mortgaged property would be likely to ensue.

We are aware that in Slee v. Manhattan Co., 1 Paige (N. Y.), 48, it was held in substance by Chancellor Walworth that in a case where the assignee of a mortgage becomes the purchaser of the premises at a sale made under a power given by the mortgage, that, the assignee having become the purchaser at his own sale, there was no transmutation of the interest of the mortgagee; that his interest in the mortgage "remained untouched by that foreclosure," and that the purchaser had acquired thereby only the equity of redemption. The learned chancellor further indicated his opinion that the same consequence would ensue in the case of an assignee of a mortgage bidding in the property at a sale under a decree in a suit brought by him to foreclose the mortgage. This was obiter. But the case has been accepted by the courts of New York as authority for the application of the doctrine to judicial sales, as well as to sales under a power in the mortgage deed. The chancellor in his opinion admitted that the authority to execute the power was vested in the assignee "by the mere act of the assigning the legal interest in the mortgage," and that if the assignee in the fair execution of the power had sold and conveyed the premises to a stranger for one-half the amount of the debt, the assignor would have been bound to pay the balance of the debt, and would have had no claim to redeem the mortgaged premises from such purchaser; "that he must have understood that the defendants (the assignees) had a right to foreclose under the statute. The premises were advertised and sold with his full knowledge of the facts, and he made no objection that they were not thus authorized to proceed." And the chancellor further says that if the assignee had foreclosed in chancery, "a stranger purchasing under the decree, would unite the legal estate which is in the defendants [the assignors] with the equity of redemption of the mortgagors sold under the decree and thus acquire the whole estate which existed in the mortgagors previous to the giving of the mortgage." But because the premises were bid off by the assignee (in that case they were sold to a person who was an agent of the assignee, who conveyed them to his principal) the chancellor held that the assignor's interest had not been cut off by the sale. This is opposed to the decision in Richards v. Holmes, supra. There might be good reason for holding in such a case that if any injury had been done to the assignor in consequence of the assignee's bidding, the

former could have elected to disaffirm the sale. But the dictum that the sale to the assignee under a decree would be ineffectual to pass the title of the assignor, and the distinction made between a purchase by the assignee, and one made by a stranger cannot be supported, when it has been admitted that the assignee may bid at the sale. In such a case the thing sold is not one thing if sold to a stranger and another thing if sold to an assignee. They were not bidding for different things, and the deed of the master is for the thing sold.

Coming, then, to the agreement of October 4, 1844, it is apparent that Butler knew that Anderson had bid off the property, and he consented that the sale should go on to its consummation. It was not stated that the expected deed should be affected by a trust, and the insistence with which Anderson, by the stipulation of his contract, held on to the benefits of his purchase is indicative of his understanding in making the agreement, and it was indicative to Butler of Anderson's expectation. The latter relinquished the control of his other securities and gave Butler the power to discharge Bissell's liability upon his note. It seems singular that Anderson would have practically stripped himself of the control of everything else in the nature of a security to a slow debtor for so large a sum as $29,000 unless he were to gain some substantial advantage under his purchase at the master's sale. And it is noteworthy that in the deeds which Butler obtained from the sons of Henry Anderson after the latter's death and which deeds will hereafter be more particularly considered, they are moved to recite that Henry Anderson took the title to said lands as security for Butler's debt and that he died without "having made or executed any declaration in writing of the purpose for which said property was held;" which seems to indicate that such a declaration was due and expected, and the inquiry is pertinent, why, if there was such an understanding, nothing was said about it in the agreement of October 4, 1844. Butler seems to have been very watchful for his own interests, and it seems unlikely that so important a matter should have then been overlooked and not taken care of until several years after Anderson's death and only developed while the trustees were settling his estate. But the material circumstance, now to be regarded, is that there is no fact agreed, or finding by the court which imports any qualification of the legal effect of the foreclosure proceedings, the agreement of Butler and Anderson made pending those proceedings, and the master's deed following thereon. We have given detailed exposition of special facts for the reason that it is proposed to fasten a trust upon the deed in question by proof of subsequent transactions and thereby raise an equity which would entitle the defendant to the possession of the premises notwithstanding it should be held that the plaintiff has the legal title. We think it must be held that at the time of Henry Anderson's death he held the legal title to the lands in question unaffected by any trust in favor of Butler.

On February 28, 1846, Henry Anderson made his will, and on the 3d day of April following he died, being then a resident of Mississippi. He was at the date of his will and at the time of his death a widower.

He left two children only, William, born February 12, 1828, and James H., born June 25, 1831. The parts of this will which are now material are here set forth:

"I, Henry Anderson, do make and ordain this to be my last will and testament. I declare my domicile to be the town of Holly Springs, Marshall County, State of Mississippi. I revoke the will made by me on the 3d of March, 1837, and all other wills, if any there be.

"Item. I give, devise and bequeath to Peter Anderson, Walter Goodman and Peter W. Lucas all my property, both real and personal, legal and equitable in possession, reversion or remainder, and all claims and demands whatsoever, except such right, title or claim to land, money or choses in action as I may be entitled to as one of the agents of the American Land Company and as one of the stockholders of said company; this property they shall hold in trust, and if one or more of them die, the survivors or survivor shall hold in trust for the following purposes: They shall pay my debts, other than such as may be owing to the American Land Company, out of moneys on hand and such property as may be sold least injurious to my estate. I wish them to collect debts due to me and apply to this purpose. They may, if they think fit, and can, obtain an extension of time on any debt, and they may pledge my property to raise money to pay debts. They may sell for cash or on credit, and if at any time they have funds on hand not required for debts or legacies they may invest the same. They shall have full power to make titles for property sold and to pay charges for preservation, and in all respects have the power of owners, but always as trustees. I have entire confidence in each of them, and therefore give each the power of all, so that each may do separately what all acting together may do, except in making investments; in that I wish all to join. The annual accounts of my said trustees, signed by their respective names, shall be binding on my heirs and shall be conclusively so unless error or fraud be clearly established. I have directed the payment of debts other than what I may owe the American Land Company. I exclude the debts to the company because that is subject to an account with the company, and I do not wish my trustees to make payments before that account is adjusted. The adjustment of that account, and the direction and management of the affairs of the company, so far as I have power, right or interest, I place in the hands of Peter Anderson and Walter Goodman, and when they have finally closed it, it shall become a part of the trust created by this article of my will and subject to the control of my said trustees. By saying 'it shall become a part of the trust,' I mean the effects and proceeds that I may be entitled to as stockholder and agent of the company. * * *

"Item. It is my will that when my son William arrives at the age of twenty-one years the trustees of the first and general trust shall deliver to him a settlement of the affairs of the trust, and if my debts are then paid, and as soon as that takes place, they shall put him in possession of one-half of my property, reserving thereout two-fifth parts of said moiety by valuation, which my said trustees shall hold in trust and properly invest and pay over to him at the age of twenty-five years. If my interest in the American Land Company be not brought into the general trust at the time William becomes twenty-one, but is brought in at any time before he arrives at twenty-five, so soon as brought in, two-fifths shall be deducted therefrom and invested and paid over to him at twenty-five, the other three-fifths he shall have as soon as paid in. I find the above does not express my will in this: When I say two-fifths shall be deducted from the interest I may have in the land company for investment, and three-fifths to be paid to him, I mean two-fifths of a moiety shall be deducted and three-fifths of a moiety paid over.

"And it is my will that my said trustees hold and invest and pay over the remaining moiety of my estate to my son James at the respective periods of twenty-one and twenty-five years of age, being governed as to the amounts to be paid at each of the respective periods by the same rules and directions as are above laid down in the bequest to William, and to be governed in all other respects by the regulations laid down concerning the same.

"If either of my sons die without lineal descendants, the one surviving shall take his estate above bequeathed, and, if the survivor dies without lineal descendants, then one-half both of the decedent's original portion, as well as one-half of the portion taken by survivorship, shall go to by brother Peter, the other half to such of my brothers and sisters as may be living at the time of the death of such surviving son. If my brother Peter be not living at the time of the death of my surviving son, so dying without lineal descendants, then the share he would have taken, if living, shall go to his children living at the time of the decease of my said son, and if there be no children surviving, then the share shall go to my other brother and sisters surviving at the time of such decease of my son. I make the following explanation: The limitation over on the death of my surviving son without lineal descendants is intended to take effect if there be no lineal descendants living at the time of the decease of such son. Nothing in the foregoing will shall be construed as to deprive either of my sons disposing of their portions by will on their attaining the age of twenty-one years, respectively. The above limitations over shall give way to the provisions of such wills."

This will was duly probated in Mississippi, and an authenticated copy of the will and of the probate thereof were thereafter duly filed in the probate court of Lucas county, Ohio, where the will was duly admitted to probate and record as a will from another state. The construction of this will of Henry Anderson is the next subject which engages our attention. The particular question is, what did the testator intend by the words of the will:

"If either of my sons die without lineal descendants, the one surviving shall take his estate above bequeathed, and if the survivor die without lineal descendants, then one-half both of the decedent's original portion as well as one-half of the portion taken by survivorship shall go to my brother Peter, the other half to such of my brothers and sisters as may be living at the time of the death of such surviving son. If my brother Peter be not living at the time of the death of my surviving son, so dying without lineal descendants, then the share he would have taken, if living, shall go to his children living at the time of the decease of my said son, and if there be no children surviving, then the share shall go to my other brother and sisters surviving at the time of such decease of my son."

The other language of the will is important only as it sheds light upon the testator's meaning by the use of the language quoted. The plaintiff, who is the lineal descendant of the testator's surviving son, James H. Anderson, claims that the testator intended to give to each of his sons a life estate in his moiety with a remainder over to the survivor of the one first dying, in the event of his dying without lineal descendants, and to the survivor a life estate in both moieties with remainder over to the lineal descendants if such should be living at his death, and if not, then to the testator's brother Peter one-half and to his other brother and sisters one-half, or, if Peter should not then be living, to Peter's children, if any, and if there be none, then to the surviving brother and sisters of the testator. If this is correct, the plaintiff took an estate in remainder in both moieties on the death of his father, James H. Anderson. The defendant claims that the testator intended that each of his sons should take a fee simple in one moiety, which would be defeated by his death without lineal descendants, in which event the surviving son should take a fee simple in that moiety which with the fee simple in his own moiety would be defeated by his dying without lineal descendants, in which event, the whole estate

would go to the testator's brother Peter, etc.; in other words, that each of the two sons of the testator took an estate in fee simple; which would be defeated if the survivor died without lineal descendants, whereupon the testator's brother Peter and the other collateral relatives would take the estate by way of an executory devise.

The rule by which the court will be guided is stated by Chief Justice Marshall in Smith v. Bell, 6 Pet. 68, 75, 76, 8 L. Ed. 322, 325, as follows:

"The first and great rule in the exposition of wills, to which all other rules must bend, is that the intention of the testator, expressed in his will, shall prevail, provided it be consistent with the rules of law. 1 Doug. 322, I W. Bl. 672 et seq."

And this statement has been repeated and confirmed in many subsequent cases. Brant v. Virginia Coal and Iron Co., 93 U. S. 333, 23 L. Ed. 927; Blake v. Hawkins, 98 U. S. 324, 25 L. Ed. 139; Giles v. Little, 104 U. S. 296, 26 L. Ed. 745; Colton v. Colton, 127 U. S. 309, 8 Sup. Ct. 1164, 32 L. Ed. 138; Hardenberg v. Ray, 151 U. S. 126, 14 Sup. Ct. 305, 38 L. Ed. 93; Home v. Noble, 172 U. S. 391, 19 Sup. Ct. 226, 43 L. Ed. 486; Adams v. Cowen, 177 U. S. 475, 20 Sup. Ct. 668, 44 L. Ed. 851; Robbins v. Smith, 72 Ohio St. 1, 17, 73 N. E. 1051. And in order to "attain the general intent," said the court in Inglis v. Sailors' Snug Harbor, 3 Pet. 99, 7 L. Ed. 617, "words of limitation shall operate as words of purchase, and words of implication shall supply verbal omissions."

Another rule in the construction of wills is that we are to put ourselves in the place of the testator and search all parts of the will in order to gather his meaning in the use of the words employed in the particular parts of it. If, by so doing, we become convinced in regard to his general purpose, we use that light in preference to arbitrary rules. But if the testator's meaning cannot be clearly discerned, we are at liberty, and, generally for the sake of certainty in the possession and transmission of estates, required, to apply such rules of construction as have by long usage been approved and used. It often happens that in wills in which the provisions are complex and elaborate, especially in such as are written by testators themselves, implications are seen where the testator has assumed as understood what he has not in terms expressed; and in such case, if the implication is clear, it has equal effect, as if the purpose had been expressed in words. The relevancy of these observations is found in undertaking to determine what consequences the testator intended when he said, "If either of my sons die without lineal descendants the one surviving shall take his estate above bequeathed, and if the survivor die without lineal descendants, then" to his collateral relatives. Now, we cannot but think that to the common understanding this language would convey the meaning that in the other alternative—that is, if the sons should leave lineal descendants—it was intended that they should take, and that it was only in the event of their not leaving lineal descendants, that the estate should go over to collateral relatives. The reason which gives force to the familiar rule of construction, that the inclusion of one alternative is the exclusion of the other, and vice versa,

would tend to confirm the impression. Moreover, the whole paragraph shows beyond doubt that the testator intended to prefer his lineal descendants to the collateral branches of his family. After providing that his sons should take the estate by moieties, his mind went forward to the time of their death. The working of the natural instinct to keep the property in the family becomes evident. He does not say if either of my sons shall die "without heirs," but without "lineal descendants." He evidently chose his words, and the distinction is clear. It would not comport with his idea that the lineal descendants should take as heirs. Nor did he intend so wide a class. He made a distinct blunder if he discarded the familiar term "heirs" and employed the selection of "lineal descendants" if he had in mind a succession by inheritance, and not by purchase. We are now considering this paragraph as if it stood unaffected by anything else in the will, and we cannot but be much impressed by the considerations which tend to the conclusion that the testator intended that if the survivor of the sons should die leaving lineal descendants they should take the remainder.

Then, if this were doubtful, there is a long established rule of construction of devises in the law of real property, one of such as were referred to in the early part of our discussion of this subject, that when a devise can, without doing violence to the language of the testator, be construed as creating a remainder, it shall not be construed as being an executory devise. 3 Comyn's Dig. 450, Devises N. 17; Fearne on Remainder, 393; 6 Cruise Dig. Tit. 38, c. 17, § 11; Purefoy v. Rogers, 2 Saund. 380; 2 Washb. on Real Prop. (3d Ed.) 565; 4 Kent. Com. 263; Doe, dem. v. Considine, 6 Wall. 458, 475, 18 L. Ed. 869; Blanchard v. Blanchard, 1 Allen (Mass.) 223; Moore v. Lyons, 25 Wend. (N. Y.) 119, 126; Wolfe v. Van Nostrand, 2 N. Y. 436.

In Purefoy v. Rogers, supra, which has always been regarded as a leading case, the Lord Ch. J. Hale said:

"Where a contingency is limited to depend on an estate in freehold which is capable of supporting a remainder it shall never be construed to be an executory devise but a contingent remainder only, and not otherwise."

And in the note by Patterson and Williams to the Sixth Edition of Saunders, it is said that:

"This rule so laid down by Lord Hale has been uniformly adhered to ever since."

And upon the matter of construction Washburn says (second volume, 506, same edition), citing 2 Cruise Dig. 203:

"The term remainder, it should be observed, is not one of art which is necessary to employ in creating an estate in expectancy, such as has been described. Any form of expression indicating the intention of the grantor or devisor to do this would be sufficient."

Executory devises were the creation of the judges to effectuate the intention of testators where their purpose could not take effect as the creation of a remainder. A good illustration of this subject would be to suppose that in the present instance the testator had devised to each of his sons "his heirs and assigns" the moiety, etc., and

then in another place had devised the estate over upon the happening of some contingency. The estate going over could not take effect because there could be no remainder of an estate in fee simple. It is therefore construed to be an executory devise which will defeat the fee-simple estate. It is so done because the intent of the testator would be otherwise disappointed. The case of McArthur v. Scott, 113 U. S. 340, 5 Sup. Ct. 652, 28 L. Ed. 1015, is one where both species of estates were created by the will. The testator devised his property to trustees who were to hold it until his children were dead and until his youngest grandchild should be 21 years old, whereupon the trustees were to divide and turn it over to his several grandchildren in fee, and if any of them should have died leaving children, then to the children of such grandchild. As to the grandchildren living at the time of distribution, it was held they took an estate in remainder; but as to the children of deceased grandchildren it was held that they took by way of an executory devise. This last result followed because of the death of those grandchildren before the expiration of the precedent estate in the trustees, and therefore a gift to them could not be held to be a remainder. But to give effect to the probable intention of the testator, it was construed as an executory devise.

The essential conditions on which there can be construed to be a remainder are that there must be a precedent estate which will necessarily terminate at some future time, and there must be nominated a person who will be in esse at the termination of the precedent estate competent to take the remaining estate. Both estates must be created at the same time and by the same act or instrument. And the one must begin when the other ends. The order and succession of the estates was a requirement of the feudal system in order that there should at all times be some one to perform the obligations due to the sovereign, or his immediate feudatory, from the tenant on account of his tenure. Enough remains of this requirement to support at least in technical contemplation the rule as it formerly existed. Now, if these provisions of Anderson's will be held to convey a life estate to the sons with remainder to his lineal descendants, we have the most common form of an estate in remainder. It is not necessary that the remainderman should be in esse at the time when the will is made or becomes effective by the death of the testator. It is enough if he is in being at the time when the estate vests in possession; that is, at the termination of the particular estate. If the remainderman is in esse at the death of the testator, the right vests immediately, if not, the right is suspended, but exists in consideration of law, until he comes into being, whereupon it vests, and in either case the estate will open to let in after-born remaindermen, if any such appear. Doe v. Perryn, 3 Term. R. 484; 3 Comyn's Dig. Estates, B. 13; 4 Kent Com. 206, note b; McArthur v. Scott, 113 U. S. 340, 380, 5 Sup. Ct. 652, 28 L. Ed. 1015.

The contention of the defendant rests upon the assumption that the language of the will imports a devise of an estate in fee simple to the sons of the testator, and this assumption would probably be well taken

if we looked only to that part of the will which devises the property to them. It is true there is no mention of heirs, but it would in the case supposed be implied that the testator intended to devise the whole estate. But the implication is removed, if from other provisions in the will it is seen that the testator did not intend to devise an unqualified estate. And it is to be observed that the defendant's contention proposes to cut down the fee simple which the earlier parts of the will are said to devise to the sons, by a condition that the sons shall leave lineal descendants. So, in either construction of the parties, the implication which would arise from the unqualified language of the devise to the sons cannot prevail. The generally accepted rule now is that an unqualified gift in wills to a devisee without mention of heirs imports a fee simple absolute; or, if the testator has not so great an interest therein, such an estate as he has. And this rule is incorporated in Rev. St. Ohio, 1906, § 5970. But this cannot apply here, as we have shown, for confessedly the gift was not of a fee simple absolute. The conditions therefore exist for the application of the rule laid down by the Lord Ch. J. in Purefoy v. Rogers, supra.

·The early rule in England was that such an implication as results from such language as is employed in this will would be sufficient to indicate that the testator meant that the lineal descendants of his sons should take an estate in remainder upon the death of the sons. In the early editions of Jarman on Wills, p. 465, the author in treating of estates by implication in wills, said:

"In the application of this principle, our chief topic of controversy has been how far a devise to any person, in the event of the nonexistence or on the decease of another indicates an intention to make the last-named person a prior object of the testator's bounty. In such cases it is probable that the person whose nonexistence is made the contingency on which the devise over is to fall into possession is placed in this position for the purpose of taking the property in the first instance; and this probability is of course greatly strengthened if the devisee is the person on whom the law in the absence of disposition would cast the property."

And there are several decisions of the courts in this country which have put the same construction upon such language. Shaw v. Hoard, 18 Ohio St. 228; Wetter v. United Hydraulic Cotton Press Co., 75 Ga. 540, where the foregoing passage from Jarman is quoted; Carr v. Green, 2 McCord (S. C.) 75. And Washburn, in his treatise on the Law of Real Property, lays down the rule in accordance with these decisions. He says:

"An instance of an estate tail by construction, where there is no direct limitation to the heirs of the donee's body, would be an estate to A. with a proviso that if he shall die without heirs of his body, the estate shall revert to the donor or go over to one in remainder. Here, it will be perceived, that there was no direct limitation to the heirs of A., and it is too plain for doubt that the donor intended the heirs of his body should take it at his decease, for he gives it over, or reserves it, in case he has no such heirs, and only in that contingency." 1 Washb. on Real Prop. (3d Ed.) 87; Id. (6th Ed.) § 192.

The case of Shaw v. Hoard, supra, is much in point; so like the present, that if a rule of construction be also a rule of law in its application to grants and gifts of real property and that case is the

law in Ohio, we should feel bound to accept it as controlling this question in the present case, if indeed we did not agree with it. In that case, the will of the testator contained the following items:

"Item 2. I give and bequeath unto my said wife and daughter all the real estate of which I may be seized at the time of my death, to each one-half.

"Item 4. On the death of either my wife or daughter then the survivor shall have all the property left them by me; and if both die without leaving any heirs of their body, then and in that case, said property shall be given to my wife's brother, William Campbell."

The wife and daughter died leaving another daughter of the mother. It was held that the wife and daughter mentioned in the will took each a life estate and that upon the death of the survivor, the remainder went by implication to the other daughter, the "heir of her body." But it is said that that case is overruled by subsequent decisions of the Supreme Court of that state. The principal cases which are relied upon in support of this contention are Carter v. Reddish, 32 Ohio St. 1; Piatt v. Sinton, 37 Ohio St. 353; Collins v. Collins, 40 Ohio St. 353; and Durfee v. MacNeil, 58 Ohio St. 238, 50 N. E. 721. In the first of these cases, the judge (Chief Justice Day.) who had delivered the opinion of the court in Shaw v. Hoard, was a member of the court. No intention to overrule the case of Shaw v. Hoard is indicated, nor is the case mentioned. But Judge Scott, who delivered the opinion, distinguishes a case involving the facts of Shaw v. Hoard. After referring to the cases of Parish's Heirs v. Ferris, 6 Ohio St. 563, and Niles v. Gray, 12 Ohio St. 320, cases upon which the later decisions referred to rest, he says:

"Still, we should have no hesitation in finding, from the language of the will before us, that the testator intended a life estate only for the first devises, if the sole condition of the limitation over to the nephews and nieces had been the dying of his children without issue, and without reference to the time when they should die. But such is not the language of the will."

The difference was that the case supposed was the case, in its facts, of Shaw v. Hoard, and of this case, while in the case in which the judge was giving the opinion, the device over was in the contingency of the first devisee's dying within age and without lawful issue. The distinction rests upon the fact that the contingency on which the life estate would terminate was uncertain, for the first devisee might attain the age of 21 and have children, in which event there would be no remainder, for both conditions would not happen. And, as we have said, a remainder must depend upon a contingency which must surely happen. Nor do the other cases mention the case of Shaw v. Hoard. It may well be that its facts having been once distinguished, the court in the later cases thought it unnecessary to repeat the distinction and decided the cases upon its view of the special facts. However that be, that court has always adhered to the general rule that the intention of the testator is to be gathered from all parts of the will, as well from what is expressed as from what is fairly implied. Referring to the other cases which are cited to establish that Shaw v. Hoard has been overruled, we observe that in Piatt v. Sinton, 37 Ohio St. 353, the testator devised "all my prop-

erty of every description" to Lucinda Piatt * * * and in case she should die without any legitimate heirs of her body, then the same property to go over to others named. The court construed "all my property" as "all my estate," and the heirs of the body of Lucinda Piatt were strangers to the blood of the testator. In Collins v. Collins the testator devised a life estate to his wife with remainder to his two sons and their heirs, but that in the case of the death of either leaving no children, then to the survivor. But in case of the death of both of the sons leaving no children, then to the testator's heirs. In that case the estate was granted by "clear and decisive words," and the rule laid down in Thornhill v. Hull, 2 Clark & Fin. 22, was applied, which is that:

"It is a rule of the courts in construing written instruments that where an estate is given or an estate conveyed in one clause of the instrument in clear and decisive terms, such interest cannot be taken away or cut down by raising a doubt upon the extent and meaning and application of a subsequent clause, not by inference therefrom, nor by any subsequent words that are not as clear and decisive as the words of the clause giving the interest or estate."

Moreover, an estate in remainder cannot rest upon an estate in remainder when the latter is given to one and his heirs, for the whole estate is exhausted. In Durfee v. MacNeil, 58 Ohio St. 238, 50 N. E. 721, the testator "devised all my estate, after defraying expenses, etc., to three persons equally, one of whom was then unborn, and to their heirs forever, and should the child not be born alive, or should either die without heirs, each one's share should go to the survivor," and in the event that the testator should be without heirs of his body, the legacies to his children should go to his wife. No question arose of the kind here involved. The facts in the case had little or no analogy to the present. There was a clear and decisive gift of an estate in fee simple, and the contingency was that either of the children should die without heirs capable of inheriting. The devise over was held to be an executory device. Sometimes it is stated by the courts (we are not now referring specially to the Ohio courts) in terms that the implication must be a "necessary" implication, but by this is meant not absolutely necessary, but that it is reasonably necessary in order to carry out the intention of the testator. Inasmuch as the case of Shaw v. Hoard has never been expressly overruled and its doctrine was in a later case confirmed, even if it should be held that the rule of construction is not settled, this court would decide the question upon its own understanding of the law applicable to it.

Much reliance is placed by counsel for defendant upon the case of Abbott v. Essex Company, 18 How. 202, 15 L. Ed. 352, which they claim "is parallel with and conclusive of this case." But this is a misconception. In that case the testator had given to his two sons John and Jacob "all my estate," to use his own words, in a certain described part of his property real and personal, and then declared that if either of his said sons should die without any lawful heirs of his own, it should go to the survivor and his heirs. And he charged the payment of certain debts and a legacy for the main-

tenance of a person named, upon the estates devised. After some preliminary observations, Mr. Justice Grier, who delivered the opinion of the court, said:

"Our inquiry must be, therefore, from an examination of the whole context of this will: (1) Whether, independent of the second clause, by which the estate is limited over, the sons took an estate in fee simple, or only a life estate; and (2) whether he intended to give over the share of each to the other on the contingency of his death, without issue living at the time of his decease, or upon an indefinite failure of issue."

He then proceeds to state the reasons for thinking the testator intended to give a fee-simple estate to each of the sons. The first reason stated was that the testator in the devise to the sons had employed the words "my estate" in the property, which the learned justice said had "always been construed to describe not only the lands devised, but the whole interest of the testator in the subject of the devise." And, as to the legacy for maintenance, he points out that it would be defeated by the death of a tenant for life. He further observes that the will stated that the payment of these debts and legacies by the devisees was the consideration for the devises, and that the devisees by acceptance of the devises, became personally liable to pay the debts and legacies charged upon them. "In such cases," he says, "it is well settled that the devisee takes a fee, without words of inheritance." "On this point, therefore," he says, "we are of opinion that John and Jacob each took a fee in their respective share, or moiety, of the estate delivered to them." None of the reasons on which the conclusion of the court was rested exist in the present case.

If, however, it should be held that the alternative phrases in the will already considered are not sufficient to show that the testator intended the lineal descendants should take a remainder, we should next consider the will upon that assumption. In the English courts the rule upon this subject has been changed by the modern decisions and its present state is exhibited in the case of Scale v. Rawlins, L. R. 45 Chan. Div. 299, and App. Cas. (1892) 342, sub nom. Rawlins Trust. In the Court of Appeals, Lord Justice Fry stated that the modern rule was inaugurated in Green v. Ward, 1 Russell, 262, a case decided by Lord Gifford, the master of the rolls, in 1826. That rule is this: That the mere fact that the testator has directed that the estate shall go over to other persons if the first takers shall die without surviving "heirs of his body," "lineal descendants," or other equivalent words, is not a sufficient implication to create a remainder in such "heirs of his body" or other person or class named; but that if there be other language in the will which supports the implication and upon the whole the court is satisfied that such was his purpose, it will give the devise effect accordingly. None of the decisions in Ohio or elsewhere have sanctioned a stricter rule than this. It may be observed in passing, that one cannot help noticing that the English courts carry the practice of applying fixed rules to the construction of devises to an extent which is not generally adopted in this country. This may probably be explained by what was said by Mr. Justice Grier in Abbott v. Essex Company, 18 How. 202, 213, 15 L. Ed. 352, 355:

"If wills were always drawn by counsel learned in the law, it would be highly proper that courts should rigidly adhere to precedents, because every such instrument might justly be presumed to have been drawn with reference to them. But, in a country where, from necessity or choice, every man acts as his own scrivener, his will is subject to be perverted by the application of rules of construction of which he was wholly ignorant."

But, pursuing the inquiry above suggested, we see that the testator emphasizes the alternative he had stated by adding:

"I make the following explanation; the limitation over on the death of my surviving son without lineal descendants is intended to take effect if there be no lineal descendants living at the time of the decease of such son."

It is observable that his explanation relates to the death of the surviving son. He plainly intends that the presence of lineal descendants at that time shall block the way to a devise over to the next preferred classes of relatives. And he repeats the designation of "lineal descendants" instead of "heirs." He certainly intended that if such persons were living the estate should go to them in some character, and he gives them a peculiar designation. Then, again, if a fee simple was intended to be vested in the sons, words of inheritance must be implied in the gift to them, as if the gift run to him, his heirs and assigns, in express terms. To be in harmony with this, the defeasance would naturally have been incident to his dying without heirs, and it would follow that the testator used the expression "lineal descendants" as a synonym for "heirs," which we must think an inadmissible proposition. The recent case of Home v. Lippardt, 70 Ohio St. 261, 71 N. E. 770, is pertinent to this discussion. In that case, the testator, as here, gave his estate to the first taker in general terms, later on he gave him a qualified power of disposition. And the court said:

"The clear implication of such a bequest, taking all the parts together, is that B. (the first taker) is to possess a life estate. Here a life estate is implied, and is not expressly created."

The power to dispose of the property was not inconsistent with the gift of a fee simple. It was an incident of such an estate. But the court laid hold of it as an implication that the testator intended only a life estate in the first taker. It certainly was not an absolutely necessary one. It was necessary only for the purpose of giving effect to the apparent intention of the testator.

There is another consideration which must not be ignored. The authorities recognize a more significant purpose in an implication which tends to cut down a larger estate to a life estate where the remainder thereby passes to a person who is in the line of descent than it would if it were to pass to a stranger. This results from the stronger motive which the testator would have to prefer the former to the latter class. The gift of the power to dispose of the property by will when the sons should reach the age of 21 does not enlarge a life estate. Jones v. Shields, 14 Ohio, 359; Baxter v. Bowyer, 19 Ohio St. 490; Stableton v. Ellison, 21 Ohio St. 527; Huston v. Craighead, 23 Ohio St. 198. We are therefore of opinion that the in-

tention of the testator was that the lineal descendants of the surviving son should take an estate in remainder at his decease.

The persons named as trustees accepted their appointments, and they also qualified as executors. William Anderson became of age February 12, 1849, and on October 10th of that year Butler obtained from him an agreement in writing, declaring himself to be an heir at law of Henry Anderson, and that Henry Anderson "held and intended to hold" the premises in question in trust to secure the payment of Butler's note; that said Henry Anderson had died without declaring said trust in writing, and that, being desirous of carrying into effect his father's wishes and intentions, he had "consented to execute and deliver to the said Butler this declaration of the terms and conditions on which he holds the title to the premises above referred to remaining unsold at the date hereof." And Butler therein agreed to pay to the executors the sum due on his note of $20,000 in installments and at dates therein specified. William died intestate in January, 1850, unmarried and without issue. James Anderson became of age June 25, 1852. But before that time, and on September 16, 1851, Butler obtained from him a like declaration that Henry Anderson held the premises in trust, but that he having died without having made or executed any declaration thereof, he, James, in order to carry out his father's wishes and intentions, was desirous of making the declaration. But it was therein stipulated that the lands should be held subject to the payment of the principal and interest of the debt due from Butler. On October 1, 1852, there was appended to this document a "memorandum" between Butler and James containing an agreement to change dates of payment of the note, and that the agreement should be taken as supplemental to the agreement to which it was appended. Thereafter, from time to time, Butler made payments to the executors and trustees upon his $20,000 note, but the same had not been fully paid at the time when the executors and trustees settled their trust with James H. Anderson and turned over to him the property and effects coming to him under said will, which was some time prior to May 1, 1860. If any more payments were made on said note, they were made to James H. Anderson. The plaintiff is the only son and child of James H. Anderson, and, as has been stated, was born August 27, 1859.

About the 1st of May, 1860, Peter Anderson and Walter Goodman, styling themselves "executors and trustees of Henry Anderson's will," delivered a quitclaim deed of the premises in question to Butler, reciting therein the receipt "of $1 (and other considerations)." The deed recited further that it "being understood that the above-described premises were conveyed to Henry Anderson in fee but held by him in his lifetime as a mortgage to secure the payment of a certain sum of money due from Charles Butler, which fact after his death was duly acknowledged under seal of William Anderson and James H. Anderson, his only heirs at law," said first parties covenant, grant, etc. This deed purports to have been made October 1, 1855, and acknowledged October 9, 1855, but, as above stated, it was not delivered until about May 1, 1860. On April 17, 1860, Lucas,

the other executor and trustee, but signing as executor, executed and on or about May 1, 1860, delivered to Butler a deed of the same premises in the same form, for a like consideration, and with the same recitals as the deed from Goodman and Peter Anderson. On April 23, 1860, Butler gave a warranty deed of the lands in question to Calvin Bronson, who soon after entered upon the premises and he and his grantees have since occupied and possessed the same under claim of title through that deed. The defendant holds the title conveyed by the Butler deed to Bronson.

The questions upon the facts occurring since the death of Henry Anderson are, first, whether, assuming the latter to have then had the legal and equitable estates in the land, the deeds from Peter Anderson, Sr., Goodman and Lucas to Butler conveyed to the latter the legal title which had been in Henry Anderson; or, second, whether their transactions with Butler raised an equity in his favor which, having been transmitted to the defendant, entitles him to the possession of the premises as against the plaintiff. The first question, then, upon this part of the case is whether the trustees had authority under the will to declare the master's deed to Henry Anderson to be a mortgage and to deed the lands to Butler at the time when this was done. Having regard to the language of the testator, there is room for doubt whether the power given to the trustees in respect to the alienation of real estate extended beyond an authority to sell or mortgage the lands of the testator for the purpose of paying debts; that specific power is expressly granted and the general language added might be thought to grant powers incidental to that main purpose. Besides, these deeds of the trustees were not made for the purpose of raising money to pay debts of the estate, but proposed a different object. But we do not decide how this may be. No doubt the rule is that unless there is by the terms of its creation a limitation upon the duration of the trust, it will be held to endure so long as the purposes of the trust require. But when the duration of the trust is expressly limited, the authority of the trustee expires according to the limitation. 1 Perry on Trusts, § 316. Says the author:

"So trustees may take only a chattel interest in real estate, although limited to them and their heirs, as when they are to hold in trust only for a short time to pay debts and legacies and to convey it to the cestui que trust when he comes of age, or at a certain time."

And, see, among the cases there cited, Goodlittle v. Whitby, 1 Burr, 228; Stanley v. Stanley, 16 Ves. 491; Pearce v. Savage, 45 Me. 90. And, also, Powell v. Glenn, 21 Ala. 458; and Smithwick v. Wintersmith, 14 S. W. 354, 12 Ky. Law Rep. 380.

Here the testator directed that the trustees should deliver a settlement of their trust to each of his sons on their reaching the age of 21, respectively, and then put him in possession of one-half of the property, except that there might be a reservation of a fraction of the moiety until the sons should respectively arrive at the age of 25, when the remaining part should be turned over to them. James, the youngest of the sons, arrived at the age of 25 on June 25, 1856, nearly four years before the trustees deeded the lands to But-

ler. No account can be taken of the fact that the deeds were prepared in 1855. They had no effect until they were delivered in 1860. It is stated in the brief of counsel that they were in escrow in the meantime; but it is not one of the stipulated facts nor found by the court, nor indeed was there any competent evidence tending to prove such fact. In these circumstances we think the duration of time for the active duties of the trustees was limited to the time when they were required to make their settlement with the beneficiaries and turn over to them the trust property. This is admitted by counsel for defendants in error, who say in their brief:

"The language of the will makes it entirely clear, we think, that the testator contemplated that the trustees should in any event fully perform and discharge their trust by the time the youngest son had reached the age of 25 years, and that at this date, at latest, the title of the trustees should cease and determine."

It follows that the deeds to Butler, so far as they are regarded as deeds of the trustees, conveyed no title, for the trust had been extinguished several years before. No judicial act was required to terminate the trust as would be necessary in the case of an executor. The testator had also appointed executors, whose powers would continue so long as the estate remained unsettled in the probate court, and the continuance of the term of the trust was not necessary. They were the same persons as those created trustees, but their relations to the estate were the same as if they had been different persons. It was not a case where the trust is imposed upon the executors as such. 1 Lewin on Trusts, § 206; Herron v. Comstock (C. C. A.) 139 Fed. 370, 377, and the cases there cited. The distinction is also referred to by Mr. Justice Gray in McArthur v. Scott, 113 U. S. 340, 377, 5 Sup. Ct. 652, 28 L. Ed. 1015. When the trust expired the legal title became vested in James H. Anderson. The executors might in certain circumstances sell and convey the lands of the testator, as, for instance, to pay debts. But this would require an order of the probate court upon notice to the parties interested.

The second question is whether the transactions between the trustees and Butler were such as to raise an equity in his favor which, being transmitted to the defendant, entitles him to retain the possession of the land as against the plaintiff's legal title. For if the defendant has an equity which thus entitles him, the plaintiff cannot recover. It was so held in Cincinnati v. White, 6 Pet. 431, 8 L. Ed. 452. To the same effect is Dickerson v. Colgrove, 100 U. S. 582, 25 L. Ed. 618. But we are unable to discover any grounds on which it could be claimed that any equity was created for Butler by his transactions with the trustees. It is unnecessary to say he was conscious of wrongdoing, for he may have conceived that the legal effect of the foreclosure proceeding left Henry Anderson in the position of a trustee for him in respect to the lands; but his course was taken entirely in his own interest, and was prejudicial to the estate. The trustees were induced by his representations to treat the master's deed to Henry Anderson as a mortgage, when in fact

it was not. The sons were induced by appeals to filial sentiment to make admissions the truth of which was taken on trust, and these admissions were adopted by the trustees as the basis of their dealings with Butler. The money which he paid to them, as trustees, upon his note was not much, if any, more than was sufficient to pay it after crediting him with the proceeds of the master's sale. He based his action in making the sale of the property upon his supposed success in acquiring it. We desire to make no further comments upon the character of these transactions than the adjudication of the rights of these parties requires, but we cannot realize any basis on which to build up anything more than the strictly legal rights which Butler acquired therefrom.

It remains to be observed that if by Anderson's will an estate in remainder after the death of his surviving son was given to his lineal descendants, it was beyond the power of the tenants for life to defeat or prejudice the remainderman by their own acts or admissions. The only way in which the remainder could have been destroyed would have been by the valid exercise of the power given to the trustees by the will. The vigilance with which the court protects the estate in remainder for infants is illustrated by the case of McArthur v. Scott, above referred to, where the will which had created it had been vacated by a decree in a suit brought by an heir at law in which children contemplated by the will as sharers in the remainder, but yet unborn, were not represented, though all the living parties in interest having life estates were. It was held that the devise to those children was unaffected by the decree, and that their respective estates became vested upon the subsequent birth of each.

The judgment must be reversed, with costs, and a new trial awarded.