**TRUSTEES CORPORATION, Limited, v. KANSAS CITY, M. & O. R. CO. et al., and four other cases.**

Circuit Court of Appeals, Eighth Circuit.
March 23, 1927.

Nos. 7343–7347.

1. **Railroads ⊗═195(2)—Member of note owners' committee and receiver's counsel held trustee for note holders in purchasing railroad's property at judicial sale.**

Where member of note owners' committee, who was also receiver's counsel, admitted in his brief that he bid for and bought property of railroad at judicial sale as trustee for all note holders, *held*, that he was liable as trustee to note holders, and was required to render strict account to his beneficiaries of all he received, and could not set up adverse title or claim.

2. **Railroads ⊗═196—Railroad reorganization plan held insufficiently to protect note holders.**

Order unconditionally approving plan for reorganization of insolvent railroad, presented by railroad receiver's counsel, providing for organization of new corporation having capital divided into 75,000 shares, 20,000 shares to be allotted for purchase to applicant and his associates, 15,000 to go to applicant and receiver as compensation for their services in receivership proceedings, and balance of 40,000 shares to be allotted for subscription to note holders at specified prices, *held* insufficiently to protect note holders' rights, and order should be entered authorizing them to purchase all the stock allotted to applicant and his associates, by paying price paid therefor, with interest, and paying applicant and receiver for their services, and in the alternative permitting note holders to purchase the 40,000 shares at same price applicant's associates paid for the 20,000 shares.

3. **Railroads ⊗═192—Conditional bid at judicial sale of railroad property, not complying with decree and order of sale, held properly ignored.**

Bid made at judicial sale of insolvent railroad's property, by one who was not a note owner or otherwise interested in the railway, which bid did not comply with requirements of decree and order of sale, and was conditional on Interstate Commerce Commission's honoring bidder's application for loan, *held* properly ignored by master.

Appeal from the District Court of the United States for the District of Kansas; John C. Pollock, Judge.

Application by Clifford Histed for confirmation of judicial sale to him of the property of the Kansas City, Mexico & Orient Railroad Company and for approval of his plan for reorganization of said railroad. From an order confirming the sale, and unconditionally approving the plan for reorganization over their objections, the Trustees Corporation, Limited, Sir George Alexander Touche and others, the American Car & Foundry Company, the American Locomotive Company and others, and P. S. Woods separately appeal. Order approving reorganization plan reversed, with directions. Appeal of P. S. Woods dismissed.

Frank M. Swacker, of New York City (Cyrus Crane and Lathrop, Morrow, Fox & Moore, all of Kansas City, Mo., on the brief), for appellants in causes 7343 and 7344.

William C. Scarritt, of Kansas City, Mo. (Elliott H. Jones, Edward S. North, and Arthur D. Scarritt, all of Kansas City, Mo., on the brief), for appellants in causes 7345 and 7346.

Denny Simrall and George H. Combs, Jr., both of Kansas City, Mo., for appellant in cause 7347.

James A. Reed and Edwin A. Krauthoff, both of Kansas City, Mo. (Reed, Holmes, Higgins & Taylor, of Kansas City, Mo., on the brief), for appellee Histed.

Before STONE and LEWIS, Circuit Judges, and SYMES, District Judge.

LEWIS, Circuit Judge. Appellants complain of confirmation of a judicial sale of

the Kansas City, Mexico & Orient Railway (called the Orient), made on March 27, 1924, to Clifford Histed, over their objections. While the objections extend in form to the sale, and objectors ask that it be vacated and for a resale; we think that, in substance, they only challenge the conduct of the bidder after the sale in presenting and obtaining approval of his proposed plan of reorganization. We say this because all appellants, except one whose objections are wholly without merit, charge that the bidder was their trustee and bid for them, which he admits. The objections were presented in the form of intervening petitions, but the court denied appellants the right to come into the case as parties and allowed them to file their petitions as objectors only. It then gave all the parties the right to be fully heard. The bidder claimed that his proposed plan of reorganization was fair and just to his cestui que trustent, testified at length in support of his claim, and the order confirming the sale to him and approving his plan of reorganization was then entered. These appeals were then taken.

The intention was conceived to construct, own and operate the railroad about 1904. It was to extend from Kansas City in a southwesterly direction to Topolobampa, on the west coast of Mexico, a distance of about 1,700 miles, its route lying partly within the United States and partly within the Republic of Mexico. The road has been constructed and operated over a part of the route and is in four unconnected sections. The one in the United States extends from Wichita, Kansas, to Alpine, Texas, a distance of 737 miles; the other three sections are all in Mexico, each being less than 100 miles in length. With the road several hundred thousand acres of grazing and timber lands in Mexico were acquired, also a half-interest in a townsite at Topolobampa. The Kansas City, Mexico & Orient Railway Company, a corporation, owned that part of the road lying in Kansas and across the State of Oklahoma. That part within the State of Texas was owned by a separate corporation, and the three sections in Mexico and the lands by another corporation. But the first named company held the issued stock and securities of the two other companies and controlled and operated them. The road as a whole has never been self-sustaining. Its expenditures have at all times exceeded its income. Because of this a receiver was appointed by the court below in 1912. Thereafter all the property was sold under foreclosure of a mortgage given to secure the

railway company's indebtedness. A committee representing the holders of its securities purchased at the sale on a bid of $6,001,000. The committee caused the organization of the Kansas City, Mexico & Orient Railroad Company, to which all of the property was conveyed, maintaining the same control and ownership of the parts lying in Texas and Mexico through other companies. The new company issued its first mortgage bonds of the face value of $31,-000,000, and for the purpose of meeting its bid the committee also caused the new company to issue and sell its $5,640,200 Six Per Cent. Gold Notes, payable in two years, and by a collateral trust agreement the Company deposited all of its first mortgage bonds to secure the payment of these notes. Again the road proved to be a financial failure under the management of the new company. None of the Two Year Gold Notes were paid, and there was default in payment of interest. So early in 1916 two self-constituted committees, proposing to represent the Gold Note holders, were organized, one in the United States and one in Great Britain. The relation between these committees and the Gold Note holders, who were willing to accept the services of the committees, and the duties of the latter were represented by a written agreement prepared at the direction of the committees. It provided for deposit of the notes by the holders with designated depositaries and the issuance therefor of transferable certificates. It recited the issuance of the Six Per Cent. Gold Notes, the execution of the mortgage by the railway company to secure the $31,000,000 of its negotiable bonds and that these bonds had been pledged to secure the payment of the gold notes. Each holder of gold notes who deposited them became a party to the agreement. It vested title to the notes in the committee and gave to the committee the right to all claims, demands and causes of action of the owners. It authorized the committee to institute such actions as it might consider desirable to protect and enforce the rights of the owners, to compromise or settle any suit or action pending or thereafter to be commenced, to borrow money and pledge the notes as security. It was declared to be an irrevocable and exclusive power of attorney from each depositor constituting the committee the agent and attorney of such depositor. In case of sale, public or private, at any time of the mortgage bonds or of the property of the railroad company it was authorized and empowered in its discretion to purchase the same for

the purposes of the agreement, at such price as the committee should consider judicious; and in event of purchase the property so purchased should be conveyed or delivered to the committee. It authorized the committee to prepare and adopt, when deemed expedient, a plan or plans for the reorganization of the railroad company or the subsidiary companies, and to carry out or cooperate in carrying out any such plan or plans on the part of the depositors. In short, depositors under the plan turned over to the committee full power and authority to act in their behalf and for their protection as owners of the notes.

Mr. Clifford Histed was a member of the American Committee, and there was deposited with the depositaries for the committee $2,905,200, face value of the Two Year Gold Notes; and with the British Committee approximately $2,000,000. On April 16, 1917, the committee for the American note owners filed its bill in their behalf as a creditor's suit, alleging default in payment of the Six Per Cent. Gold Notes and praying for a receiver of the railroad. On November 9th following the Trustees Corporation, Limited, and Columbia Trust Company, who were trustees named in the $31,000,000 mortgage and in the Collateral Trust Agreement, in favor of the Six Per Cent. Gold Note owners, filed their bill against the railroad company and others for foreclosure of the $31,000,000 mortgage and for a receiver. The court had appointed Mr. W. T. Kemper as receiver in the creditor's suit on May 16, 1917, the receivership was extended to the foreclosure suit and the two consolidated. The receiver's task was at all times a difficult and trying one. Income never seemed sufficient to meet expenses, it was hard to raise funds for that purpose, the Gold Note owners would not contribute, and too much cannot be said in his behalf and in behalf of Mr. Histed, his attorney, for their services in keeping the road going. They were of great and unusual value to all interested in the road. They went along without asking to take out present payment for their services. It was discovered after their appointment that the committee which had purchased at the prior foreclosure sale had not complied with the terms of its bid, that it had neglected to discharge liens and that the title of the company to which they caused the property to be conveyed was not a good title. For the purpose of perfecting the title and to meet operating expenses receiver's certificates were issued. Thereafter when it seemed impossible to obtain needed

funds elsewhere the receiver and his counsel, by continued and persistent efforts, obtained from the Interstate Commerce Commission its recommendation that the Government make a loan of $2,500,000, bearing six per cent. interest, to the receiver on his certificates. The loan was made on the condition that in event of default in payment and a foreclosure sale of the property, the court should order an upset price no greater than would be sufficient to take care of the principal and interest that would be due on the Government loan and the necessary costs in the suit, and that the property should be sold with the condition of continued operation by the purchaser. These conditions were embodied in an order of the court before the amount of the loan was advanced. The foreclosure decree and order of sale entered in the consolidated cause February 7, 1924, found that the Government loan made on December 1, 1921, became due December 1, 1923, that there had been default in the payment of several interest instalments thereon and that the total amount due, with interest, was $2,764,937.02, and the decree ordered:

"In the event the sum realized from the sale of the property is less than sufficient in amount to take care of the indebtedness to the Secretary of the Treasury of the United States, both principal and interest, and such other indebtedness, taxes, costs, and allowances as are given priority thereto by this decree in the distribution of the proceeds of sale, the sale or sales shall not be approved and confirmed by the Court except and until arrangement has been made with the Secretary of the Treasury for payment or extension of the indebtedness due to the Secretary of the Treasury. * * * Provided, however, that in lieu of the deposit of money herein required the purchaser may take credit on said purchase price for the amount of principal and interest due on the note of the receiver to the Secretary of the Treasury by producing and surrendering the said note together with the receiver's certificate. Or, the purchaser may in any other manner show to the court that he has made satisfactory arrangement for the payment or extension of the note due to the Secretary of the Treasury, and upon consent of the Secretary of the Treasury production or surrender to the court of the receiver's note may be waived."

The amount to be received from the sale was ordered to be distributed as to priority, first, payment of the costs of the consolidated cause and the constituent causes, includ-

ing compensation to the special master, the receiver and his counsel, the trustee litigants and their counsel, and all taxes due and unpaid at the date of confirmation of sale, secondly, to the discharge of the Government's loan and accrued interest thereon, and, thirdly, to Gold Note owners pro rata. Nothing has been paid on these notes. The decree further provided that complainants in the consolidated cause, or any holder of the Two Year Six Per Cent. Gold Notes, or any other party to the cause, or the receiver, might bid and purchase in his or its own right at the sale. The sale was made by the special master on March 27, 1924, and he reported that the highest bid made for all of the railroad company's property was that of Clifford Histed, whose bid was $3,000,000. The sale included all the property that has been mentioned. Before the sale was made application for its continuance was presented by the trustee companies in the $31,000,000 mortgage. One of the grounds stated for the continuance was the pendency of a suit on appeal to the Supreme Court of the United States concerning the validity of an order of the Interstate Commerce Commission in which it had increased the proportionate share of the Orient Railroad in the division of the rates on joint traffic with other roads. The order of the Commission had been held invalid by the district court. A postponement of the sale was denied. Immediately after the sale and on the same day Mr. Histed announced:

"Very shortly a reorganization plan will be put out, in which all of the note holders will be invited to participate. The plan will be a comprehensive one and will provide for additional capital for equipment and extension of the road. I think I may say that we now see our way to the final accomplishment of the long desired purpose, doing the things needful for the Orient."

Mr. Phillip Debell Tuckett, of London, was present at the sale representing the interests of the British note holders. On that day Mr. Histed entered into a written contract with Mr. Tuckett. In consideration of $25,000 then paid by the latter to the former, and in further consideration of $25,000 more to be paid by Mr. Tuckett to Mr. Histed on or before June 1, 1924, Mr. Histed assigned all of his right and interest in the bid which he had made for the property to Mr. Tuckett; and Mr. Tuckett bound himself to pay on or before June 1, 1924, in court, the sum of $250,000 on account of said bid, and to do all things necessary to acquire title to the property under the bid. Mr Tuckett further bound himself to prepare and submit to the court on or before August 1, 1924, a reorganization plan in which he would offer to the holders of the Two Year Six Per Cent. Gold Notes the privilege of participation upon fair and just terms to be approved by the court. One-fifth of the securities provided for in the reorganization plan to be presented by Mr. Tuckett, whether bonds or stock or both, should be allotted to Mr. Histed and issued to him or his assigns without further cost or expense, provided that in lieu of such securities Mr. Tuckett might at his option pay Mr. Histed the sum of $500,000 in cash. Time and punctuality in payment and performance by Mr. Tuckett were made essential ingredients of the contract, and in case Mr. Tuckett should fail within the times limited, then the contract should be null and void and all payments theretofore made by Mr. Tuckett should be forfeited to Mr. Histed as liquidated damages. Mr. Tuckett returned to London and attempted with the assistance of others interested to raise $5,000,000 for the purpose of taking over Mr. Histed's bid and furnishing the needed funds to rehabilitate and operate the road. On June 4, 1924, he wrote Mr. Histed that he was unable to raise the necessary funds and carry out his intended plan and that he must abandon his option under the contract. Nothing further was done in the case and no steps were taken concerning the sale to Mr. Histed until February 6, 1925, on which day he presented to the court his reorganization plan and moved that his bid be accepted and the sale to him confirmed.

The Supreme Court, in the appealed case held the action of the Interstate Commerce Commission in increasing the Orient's share of joint rates void, but it did so because of a defect in the proceedings before the Commission, and not because of lack of power to make such an order. Prior to Mr. Histed's application to the court to confirm the sale to him, he and the receiver had obtained from the Interstate Commerce Commission another order, or assurance that another order would be made, which has not been challenged, by which the Orient's share in joint rates with connecting carriers was again increased, and which, according to the testimony of Mr. Histed, increases the Orient's income about $420,000 per annum. The receiver and his counsel also had laid before the Secretary of the Treasury and the Commission Mr. Histed's proposed plan of reorganizing the road, and obtained from them a tentative consent to extend the Government's $2,500,000 loan for a period of 15 years from December 1, 1921, and to make

an additional Government loan of $1,000,-000 to be used in the purchase of needed equipment. In his plan of reorganization presented to the court on February 6, 1925, he stated the arrangement that he had made for the extension of the $2,500,000 loan and for the additional loan of $1,000,000. He proposed that the railroad property should be conveyed to a corporation to be organized for that purpose, that its authorized capital should be $7,500,000, consisting of 75,000 shares, that the net value of the company's assets in excess of its capitalization should be carried as capital surplus, that prior to taking over the property by the new company Mr. Kemper as receiver should apply to the Interstate Commerce Commission for an extension of the time for the payment of the $2,500,000 owing to the Government, and that such extension should be for a period of not exceeding 15 years from December 1, 1921, that as security for that indebtedness to be so extended the receiver should give his note and pledge his receiver's certificate therewith in that sum. He proposed that the court enter an order making that loan a first prior and underlying lien upon all of the property to be acquired by the new company, that the new company should take title subject thereto and that the lien should extend also to all property of every sort thereafter to be acquired by the new company, provided the new company might apply current operating income to the payment of operating expenses and taxes; that as a further condition of the proposed plan the receiver would first obtain an equipment loan of $1,000,000 to be certified by the Interstate Commerce Commission under the Transportation Act of 1920 (Comp. St. § 10071¼ et seq.), upon the application of the receiver which had been theretofore filed, the proceeds of which loan should be used in the purchase of locomotives, freight cars and other equipment, the terms of the obligation and the security for that loan to be such as the Secretary and the Commission would prescribe. The proposed plan also provided that the new company should assume and agree to carry out the obligations, conditions and covenants imposed upon the purchaser by the decree of foreclosure and sale, including the payment of court costs and allowances to be thereafter fixed by the court in the consolidated cause. It further proposed that Mr. Histed and others whom he had associated or might associate with himself (designated as owners) would pay into the treasury of the new company such sum in cash which, added to the cash received from the receiver at the time of con-

18 F.(2d)—49

firmation (not including the additional $1,-000,000 loan from the Government) would amount to a total of $1,250,000. Thirty-five thousand shares of the new company's capital stock, full paid and non-assessable, should be issued to and become the absolute property of Mr. Histed and his associates or their assigns. The remaining 40,000 shares should be allotted for subscription by the owners of the Two Year Six Per Cent. Gold Notes, for which they were to pay in cash at the rate of $800 for eleven shares in the new company, plus surrender by them of $1,000 face value of gold notes. If the 40,-000 shares were over-subscribed they were to be apportioned ratably and all not subscribed for, if any, would be held by the new company as treasury stock. Note holders who failed to subscribe within the time limited would not thereafter be entitled to participate in the reorganization and would have no further rights. The plan further proposed that Mr. Histed and his associates should have the right, power and authority, subject to approval of the Interstate Commerce Commission and the Secretary of the Treasury, to resell all the property and assets, either before or after the new company should be formed, at such price, whether in cash or securities, as he might deem proper, or, in his absolute discretion, to lease the property for such period of time and upon such terms as he might determine; and in either event the shareholders and subscribers for shares in the new company should share the benefits proportionately. There were other details in the proposed plan which we pass over.

The court set down Mr. Histed's application for hearing on March 23, 1925. When the hearing came on appellants all appeared and presented their objections in writing to confirmation of the sale and approval of the proposed plan of reorganization. They asked leave to come in as interveners in the case. The objections, stated in general terms, were these: (1) That Mr. Histed stood in the relation of trustee to the Gold Note owners, who were the equitable owners of the property, and further, that as counsel for the receiver his position made him trustee for them and precluded his bidding at the sale in his own right. (2) That if Mr. Histed, in making his bid, acted only in his own behalf and in violation of his trust, then his bid was grossly inadequate in amount. (3) That the sale should not be confirmed because of the greatly changed conditions since the sale affecting the value of the property, due to the order of the Interstate Commerce Commission increasing

the Orient's division of joint rates and the arrangements that had been, or would shortly be perfected, through the efforts of the receiver and his counsel in obtaining an extension of the loan made by the Government and the procurement of the additional loan for the purchase of new equipment. (4) That the reorganization plan was not fair, equitable and just to the Gold Note owners. (5) That the reorganization plan added new conditions not embodied in the decree and bid which, if confirmed, would give to the bidder special benefits and advantages, to the detriment of the note owners,—because, it is said, the changed conditions since the sale and the special rights over the property to sell or lease reserved to Mr. Histed in his plan, if open to all, would have induced a much higher bid. And it was prayed that the bid be rejected and another sale ordered; but that if the sale be confirmed Mr. Histed and his associates be held as trustees for the owners of the Six Per Cent. Gold Notes.

Appellant, Trustees Corporation, Ltd., was one of the trustees in the $31,000,000 mortgage given by the company in receivership, and in the Collateral Trust Agreement made for the benefit of the Gold Note holders. Appellants, Sir George Alexander Touche, et al., citizens of Great Britain and residents of London, England, constitute the Protective Committee for the Six Per Cent. Gold Note holders, with whom approximately $2,000,000 face value of those notes were deposited. Appellant, American Car & Foundry Company, is the owner and holder of $135,000 face value of the Gold Notes, which were not deposited with either the American or British Committee. Appellants, American Locomotive Company, et al., are the owners of $200,000 face value of the Gold Notes, which were deposited with the American Protective Committee. Appellant, P. S. Woods, claims to have qualified as a bidder at the sale and that the bid which he made or offered to make should have been accepted by the master.

Mr. Histed in this testimony gives a full history of the road, its financial embarrassments, the constant and persistent efforts of the receiver and himself to prevent its abandonment, the hesitation and delay of the Director General in taking it over during Federal Control, and the reputed remark of the Director General at the time that it should not have been built and ought to be abandoned. He testified that no new rolling stock had been purchased since it was first put in operation, and that its cars were in such condition that connecting carriers would not receive them, which required the unloading and reloading of outgoing shipments. But he had hopes for its future, and testified that under the reorganization plan and the betterments and economies which it was intended by the plan to carry out, the road would likely become self-sustaining. He showed the repeated, persistent and almost constant efforts of the receiver and himself to induce the American and British note owners to give help to the road in receivership. He made one or more trips to London for that purpose. The note owners were advised from time to time of the road's condition and its necessities but they failed to help in any way. The court had long been insistent that the road must be taken out of receivership, and this was communicated to the note owners. The American owners appear to have become wholly indifferent long before the foreclosure decree, the British committee continued to express an interest and made repeated efforts to induce contributions or devise some plan for help, and after sale the raising of funds for reorganization. It is doubtless true that conditions there since the late war caused the failure of their efforts. Assistance had been promised from that source from time to time but was never forthcoming. The court, in passing on the motion to confirm the sale and approve the proposed plan seems to have given much weight to the facts that have just been stated concerning the neglect of the note owners to render assistance and provide a way to close the receivership. Furthermore, it expressed the belief that there was no plan or method under which the road could be operated without a continuing loss and that in the judgment of the court, from its long experience with the two receiverships, it was not worth more than the amount that the Government had loaned it, unpaid taxes and court costs; and if the sale was not confirmed and Mr. Histed's plan approved the only result would be further delay and no financial assistance forthcoming from any source. Counsel representing the Secretary of the Treasury was present at the hearing and expressed approval of Mr. Histed's plan of reorganization, but withheld any comment as to its fairness to the Gold Note owners. The order of the court confirming the sale and approving the reorganization plan was entered on March 24, 1925. The court found that the Government loan of $2,500,000, with accrued interest, amounted to $2,963,249.68 on that day, that Mr. Histed at the time he made his bid deposited with the special master to be applied thereon as the decree required $50,000, which, added to the amount

due on the Government loan, for which he had arranged an extension, exceeded his bid in the sum of $13,249.68, and the court ordered this returned to him. He had the $25,000 forfeited under the Tuckett contract, so he was out of pocket $11,750.32. It seems to us, though not expressly so stated, that Mr. Histed and the receiver were acting together throughout. Of the 35,000 shares to be allotted to Mr. Histed it was arranged that 20,000 of those shares should be disposed of at $62.50 per share, thus raising the $1,250,000 which the plan proposed should be turned over to the new company. The receiver's indebtedness required all of the funds which he had in hand, and nothing was obtained from that source. It is fairly inferable from the proof that the remaining 15,000 of those shares were to belong to Mr. Histed and the receiver for their services; and no allowances were to be made to them by the court, although it was so provided in the plan of reorganization. Mr. Histed testified that that was not the intention, no claim was made for those services and a disclaimer for them has been filed.

From March 27, 1924, date of sale, to February 6, 1925, when Mr. Histed applied for confirmation, the American note owners did nothing. They manifested no interest, further than a letter of March 28, 1924, from counsel representing appellants in Causes 7345 and 7346 to Mr. Histed, referring to the sale on March 27th, and saying:

"We represent holders of gold notes of the Railroad Company which were deposited with the Note Holders' Committee, and also holders of notes not deposited with that Committee. Please inform us whether the holders of these notes whether deposited with the Committee or not have the right to participate in the benefits or fruitage of your bid on equality with each other and with the most favored participants in that bid. From the newspapers we observe that you gave out a statement concurrently with your bid as to your capacity and purpose in making the bid. Will you kindly give us a copy of that statement? We desire to know whether your bid was made for and on behalf of the Note Holders' Committee and as part of its activities or whether you regard it as entirely independent of that Committee and as antagonistic to the Committee. What we wish to determine is the legal status and rights of our clients in and to these railroad properties if your bid shall be approved."

In response Mr. Histed sent a copy of the statement which he made immediately after the sale, and from which we have quoted hereinabove. We have stated the efforts made to induce British note owners to carry through the option taken by Mr. Tuckett. After the sale none of the note owners consulted with Mr. Histed or the receiver and they gave no assistance to them in obtaining an extension of the Government loan, though that privilege was granted to the purchaser by the decree. Nor did they give aid in obtaining the second order increasing the Orient's division of joint rates. Their only manifestation was one of continued indifference. When they came in in February, 1925, to object there was no concert of action between them. A year had passed since the sale. They had had no conference for united action and came with no proposal of financial assistance. They were content to separately object. And the court could well conclude, as it did, that another sale would be an idle form without hope of betterment and that it would only mean delay, with probable loss of a chance to procure for the road the financial assistance which the plan proposed. The public which it served was entitled to some consideration. Indeed, the court's order made as a condition on which the Government loan was obtained required continued operation, and that was an important element for consideration in the case; and the plan seemed to give reasonable assurance of performance. On these considerations, and the fact that the note owners can be fully protected in their claimed rights if Mr. Histed and his associates are bound as their trustee, we put aside the objections to confirmation of sale as without merit; and come to the determining issue in the case: (1) Did Mr. Histed take as trustee, and is he liable to appellants in that capacity; (2) and if so, does his offer to the note owners in his proposed plan fulfill his obligations to them as their trustee?

[1] There are facts in the case that tend to sustain either conclusion,—that he was trustee is supported by the fact that he was a member of the Protective Committee organized with broad powers for the protection of the American note owners, and by the further fact of his being the receiver's counsel; that he intended to make his bid in his individual right and not as trustee finds support in some of the provisions of the Tuckett option contract and in the power and control over the property which he attempts to reserve to himself in his pro-

posed plan of reorganization. In seeming support of the latter, it is argued that he and the receiver had served without any compensation having been paid to them, that they had a personal interest in the sale and a right to protect that interest, which, coupled with the order of the court giving them a right to bid, made without objection from appellants or anyone else, gave them a right to bid in their own interest. The decree provided that the receiver might bid, also the parties complainant, and Mr. Histed was a party complainant as a member of the American Committee which brought the creditor's suit. In support of this contention counsel refer us to Allen v. Gillette, 127 U. S. 589, 8 S. Ct. 1331, 32 L. Ed. 271; Hammond v. Hopkins, 143 U. S. 224, 12 S. Ct. 418, 36 L. Ed. 134; Starkweather v. Jenner, 216 U. S. 524, 528, 30 S. Ct. 382, 54 L. Ed. 602, 17 Ann. Cas. 1167; Pewabic Mining Co. v. Mason, 145 U. S. 349, 361, 362, 12 S. Ct. 887, 36 L. Ed. 732; Steinbeck v. Bon Homme (C. C. A.) 152 F. 333, 339; Anderson v. Messenger (C. C. A.) 146 F. 929, 932; Scholle v. Scholle, 101 N. Y. 167, 4 N. E. 334; 1 Perry on Trusts (5th Ed.) § 195. The principle announced in these cases is not doubted. A trustee may bid, under circumstances, in his own personal right at a judicial sale, and take the property in his individual interest. That proposition, however, is not here for consideration. Mr. Histed's admissions have eliminated that as an issue in the case. In his brief he says: "Histed did not buy the property in an adversary capacity and for his individual use and benefit, but at the instance of the English note holders and for the benefit of all note holders." "Histed has never repudiated his fiduciary relationship." "The action of Histed, in proposing and submitting the plan to the court was in furtherance and discharge of a trust he had voluntarily assumed for the use and benefit of all the note holders." "The appellants having elected to claim that Mr. Histed purchased the property in trust, thereby elected to affirm the bid made and to waive all objections to the eligibility of the bidder and to the adequacy of the amount bid."

Having thus stated his relation to the owners of the Two Year Six Per Cent. Gold Notes, and the capacity in which he bid for and bought the property, we see no escape from his liability as their trustee. That one in that position must render strict account to his beneficiaries of all he receives cannot be gainsaid. In equity his bid was their property and he cannot set up an adverse title or claim. Trice v. Comstock (C. C. A.) 121 F. 620; Williamson v. Krohn (C. C. A.) 66 F. 655; Perry on Trusts, 5th Ed., Secs. 428, 433, 563.

[2] Howsoever much the note owners may have subjected themselves to criticism for neglect of and indifference to their rights, and notwithstanding we are thoroughly convinced there was no fraudulent intent and purpose on the part of Mr. Histed and his associates; nevertheless, it is our opinion that the principles just stated must be applied to this case, and the note owners given the full benefit of Mr. Histed's bid on the conditions which we will later herein set forth. We see no reason to disturb the reorganization plan in providing for the new company to be organized with the capital shares therein proposed.

The reorganization plan allotted 35,000 shares in the new company to Histed, 20,000 of which were sold to his associates at $62.50 per share to raise the $1,250,000 called for by the plan to be paid to the new company. The remaining 15,000 shares were taken by Histed and Kemper as full compensation to them for their services during receivership.

In view of the history of the road no one could place a value on the shares with confidence that he was even approximately right. From the standpoint of railroad financing, the road had no credit. It was only through the ability and efforts of Histed and Kemper that it was kept going and saved from abandonment. It seems highly improbable whether any one else could have been found who would or could carry through a plan of reorganization. These considerations and the fact that the Tuckett option fixed the compensation of the receiver and his counsel at one-fifth of the new company's capitalization, doubtless caused Histed and Kemper to regard the taking over of the 15,000 shares by them as fair to all who were interested, and the record does not persuade to the contrary. Indeed, we think a reasonably prudent man, familiar with the situation, the road's history, its future prospects and with some knowledge of railroad business in general, would have regarded compensation, if fixed by the court and paid over in money as far preferable to the 15,000 shares. But Histed bid in the property as trustee and we think it must follow that the beneficiaries are entitled to take it. The interests of the United States however, must be regarded. It extended its prior loan and made a new loan on the basis of the Histed plan and the present assets

of the company ought not to be depleted. The rights of the Gold Note owners may now be exercised for their protection, in either of two ways of procedure which we direct to be offered to them under appropriate orders of the District Court to be there entered on the issuance of the mandate herein:

First, the Gold Note owners or as many of them as are desirous of doing so, may take to themselves within four months from the date of mandate all of the new company's issued stock by paying to the holders of the 20,000 shares that were sold, in such manner as the District Court may direct, the sums at which said shares were purchased with interest thereon at (6) six per cent. per annum from dates of purchase and by paying to Kemper and Histed respectively the respective sums to be allowed to them by the District Court for their services during receivership; whereupon, all of the 35,000 issued shares shall be delivered for cancellation and reissue to the Gold Note owners proportionately to the sums paid therefor by them: Provided, the whole sum paid for the 20,000 shares and for the services of Kemper and Histed shall be the basis for ascertaining the cost of each of the 35,000 shares as between purchasing note owners.

Secondly, if on expiration of four months from date of mandate the Gold Note owners have not fully complied with the foregoing offer to them, as to be provided for in the order of the District Court, then they shall have only the right to subscribe for, within thirty days, any part or all of the 40,000 shares of the company's treasury stock at the price of $62.50 per share. If said 40,000 shares be oversubscribed they shall be apportioned according to the face value of Gold Notes owned or represented by the subscribers, but if undersubscribed the remainder may be taken by Gold Note owners in proportions to the face value of their notes, or any one note owner may take all of the remainder if there be no other subscriber therefor or part thereof. Twenty days additional to the thirty days shall then be allowed in which to adjust the rights of subscribers for the remainder in event of undersubscription, during which twenty days all subscribers shall make payments of their subscriptions, in the manner as the court may direct. Subscriptions shall be in writing, signed by the note owner, or his agent or representative, stating the number of shares subscribed for and the face value of the notes owned by the subscriber, and they shall be lodged with the clerk of the District Court and filed by him in the cause. The British and American note owners committees, hereinabove mentioned, may make subscriptions, stating therein the respective names of the note owners whom they represent and the face value of Gold Notes owned by each. In short, it is our purpose to extend to the Gold Note owners in this second offer, in event they fail to accept and carry through the first offer to them within the four months limited, the privilege of purchasing the 40,000 shares at the same price that Histed's associates purchased the 20,000 shares and to have them protected in their proportionate rights thereto under the guidance of the court by appropriate orders. The value of the property at the time of sale was too problematical to be taken as a basis on which to estimate the worth of stock in the new company. The purchasers of the 20,000 shares furnished a fund necessary to continue operation of the road, and we cannot conceive that Gold Note owners have a right to purchase at less than they paid. Indeed, it is a concession that they should now come in on the same footing, and they ought not but for the fact of purchase in trust. Failing to avail themselves of the right to take it all on that ground we think they are not equitably entitled to more.

The order approving unconditionally the reorganization plan is reversed as to appellants in appeal causes numbered 7343, 7344, 7345 and 7346, with direction to the District Court to make the orders and take the action above indicated.

[3] In cause number 7347, the appeal of P. S. Woods, his assignments of error are wholly without merit. He is not a note owner or otherwise interested in the railway. He appeared at the sale on March 27, 1924, as a bidder. He made a bid but did not comply with the requirements of the decree and order of sale to constitute him a competent bidder. His bid was conditional and properly ignored by the master. After Mr. Histed had made his bid of $3,000,000, Mr. Woods said to the master: "I will make you a conditional bid, the condition being that the Interstate Commerce Commission will honor the application for the loan that I have made application for." He then tendered to the master a bank check for $10,000, which the master did not and could not accept under the decree and order of sale, which provided that any one bidding on the property should deposit with the special master appointed to make the sale, if his

bid was in excess of $500,000, $50,000 in cash or a check in that amount payable to the master upon any bank or trust company acceptable to the master. The appeal of Woods is dismissed.

STONE, Circuit Judge. In the opinion of Judge LEWIS is a statement, with citations, respecting the right of a trustee to bid at a judicial sale, in his personal right as an individual, for the property subject to the trust. As Mr. Histed makes no claim here to having so bid but contends that he bid as a trustee and not for himself personally, I think the power or right of a trustee to bid in his personal capacity is a matter not requiring decision nor consideration in this case. The existence and the definition of such power or right are, I think, matters of grave, legal and practical concern. Therefore, I prefer to express no view thereon and leave such problem to some future case where decision thereof may be required to determine that case.

SYMES, District Judge. I fully concur in the opinion of Judge LEWIS, except as to the question of the right of a trustee to bid at a judicial sale in his individual capacity, on which question I do not at this time express any views.