**TRUSTEES CORPORATION, Limited, et al. v. KANSAS CITY, M. & O. RY. CO. et al.**

Circuit Court of Appeals. Eighth Circuit. May 23, 1928.

No. 7987.

1. Receivers ⬿196—Receiver's action, In delaying report and accounting on claims purchased by him, did not require forfeiture of compensation.

Action of receiver in delaying report relative to claims purchased by him and accounting for proceeds received from receiver's certificates subsequently issued therefor, *held* not, in view of fact that subject of balancing receiver's accounts is a problem involving large fluctuation from day to day, and that representation as to probable showing was more of a prophecy than a fact, to require forfeiture of compensation for services.

2. Receivers ⬿194—Retention by counsel for receiver of amount paid him pursuant to settlement failing to go through did not require forfeiture of compensation.

The fact that counsel for receiver retained amount paid to him as partial payment pursuant to settlement which did not go through, as a credit on the allowance to be made to him for his services, *held* not to constitute ground for forfeiture of compensation for such services.

3. Receivers ⬿194, 198(2)—Allowances to receiver and counsel are largely in discretion of court exercising control over them.

Allowances to a receiver and his counsel are largely in discretion of court exercising control over them, in that in the nature of things such court has a fuller and better knowledge than any other court can possibly obtain of extent and character of services and of their value to estate.

4. Receivers ⬿194, 198(1)—Allowance in excess of $100,000 per annum for receiver and counsel in railroad receivership held excessive.

Amount allowed receiver and counsel in excess of $100,000 per annum for services rendered in connection with receivership of railroad properties *held* excessive, though position required ability, resourcefulness, constant and patient care to every detail, and at times personal credit and financial assistance of receiver, and resulted in successful reorganization, with substantial benefits to beneficial owners.

Appeal from the District' Court of the United States for the District of Kansas; John C. Pollock, Judge.

In the matter of the receivership of the Kansas City, Mexico & Orient Railway. Company. From an order fixing compensation

to be paid to receiver and his counsel, the Trustees Corporation, Limited, and others appeal. Reversed and remanded, with directions.

Cyrus Crane, of Kansas City, Mo. and Frank M. Swacker, of New York City (H. F. O'Donnell, and J. W. Kemp, both of New York City, on the brief), for appellants.

E. A. Boyd, of Wichita, Kan., and Edwin A. Krauthoff, of Kansas City, Mo. (James H. Harkless, of Kansas City, Mo., on the brief), for appellees.

Before LEWIS and KENYON, Circuit Judges, and KENNEDY, District Judge.

LEWIS, Circuit Judge. Appellants complain of an order of the District Court fixing the compensation to be paid to the receiver of the Kansas City, Mexico & Orient Railway Company and his counsel for their services rendered from April 16, 1917, to January 1, 1927. At the time the matter was being heard below appellants' counsel said to the court the allowance should be "fair and reasonable." They say in their brief here that the amount allowed, $1,068,750, is "grossly exorbitant," "that there has been the grossest kind of abuse of trust by the receiver and his counsel. The effect of such conduct on their compensation might be to forfeit it entirely. We do not ask that; we are not attempting to get the benefit of their services for nothing; we doubt that a beneficiary is entitled to demand it." And this is followed by a suggestion that this court might exercise its prerogative and deny them anything. The District Judge was not impressed with like strictures. We will take them up later.

Much of the history of this litigation and facts relevant to the present controversy will be found in our opinion in Trustees Corporation, Ltd., et al. v. Kansas City, M. & O. R. Co. et al., 18 F.(2d) 765, to which we refer. We had occasion there to comment on the extraordinary services rendered by Mr. Kemper, the receiver, and Mr. Histed, his counsel. They pulled the road out of the mire when the task seemed hopeless, and all beneficiaries had declined to give help. The receiver and his counsel, as the foreclosure decree permitted them to do, made the accepted but hazardous bid when the sale came on—in fact the only one, the benefits of which were tendered to the Gold Note owners, including appellants here. Matters then stood quiescent in court for a year. The bidders had assumed a heavy and unusual burden. In addition to raising the $3,000,000 bid they were obligated, morally if not legally, to the United States to keep the road going. Within the year they

had made advantageous arrangements for the road's immediate future—see our opinion in 18 F.(2d)—and an oil field had been opened in the territory traversed; so when the sale came up for confirmation and approval of the proposed plan of reorganization, Gold Note owners had been inspired with some hope. Before that they had done about everything to indicate an abandonment of their interests. They came in as objectors, but without offering to do anything or presenting any plan for the road's future. They wanted both the sale and the proposed plan of reorganization disapproved and rejected as unfair to them. The court had long been insistent that the receivership must be terminated and all note-holders had been so advised repeatedly. It had been in receivership the greater part of its history and the court was of opinion it could never be operated successfully, that it was not worth more than its indebtedness to the United States and that the plan of reorganization was a fair and just one to all concerned. We considered the order made on that hearing on the appeal of these appellants in 18 F.(2d) 765. On the admission of the bidder that he bid at foreclosure sale for the note-holders, we held that his bid was their bid and they were still entitled to take the benefit of it. But they had delayed taking their appeal until the six months had almost expired, there was no supersedeas, the new company had been organized and in our mandate we directed the procedure below by which, and the conditions under which, the rights of the note-owners should be cared for in stock ownership in the new company; awarding to them, if they cared to take it on the conditions named, all of the issued stock. The paragraph of our mandate, entered by the court below, on which the note-owners were to exercise the option to take all of the issued stock reads thus:

"The Gold Note owners, or as many of them as are desirous of doing so, may take to themselves within four months from the date of mandate all of the company's issued stock by paying to the holders of the 20,000 shares that were sold, in such manner as the District Court may direct, the sums at which said shares were purchased, with interest thereon at six (6) per cent. per annum, from dates of purchase and by paying to Kemper and Histed respectively the respective sums to be allowed to them by the District Court for their services during receivership; whereupon, all of the 35,000 issued shares shall be delivered for cancellation and reissue to the Gold Note owners proportionately to the

sums paid therefor by them: Provided, the whole sum paid for the 20,000 shares and for the services of Kemper and Histed shall be the basis for ascertaining the cost of each of the 35,000 shares as between purchasing note-owners."

The written proposal of these appellants, note-owners, filed in court before the order here appealed from was entered, by which they sought to exercise their option, did not comply with the mandate. They attached to their proposal the condition that "the allowance and compensation of the receiver and his counsel are deemed by them not unreasonably high." That was a request for idle litigation, of which in the end they might or might not see fit to avail themselves as they should then choose. But by subsequent orders of the court, brought here by stipulation, it appears that the appellants have paid in on their subscriptions for the 35,000 shares on the basis of the allowance appealed from, and the point has therefore become immaterial; and there was no objection to the terms of the proposal when it was filed.

We come to the order appealed from. It is this:

"And thereupon, being well advised in the premises, the court fixes the compensation of William T. Kemper, Receiver, and Clifford Histed, counsel for the Receiver, for their services during the receivership, beginning on the 17th day of April, 1917, and until the 1st day of January, 1927, the sum of $1,068,-750. The allowance here made is to said Kemper and Histed jointly, to be divided between them in such manner as they agree."

As to form it is not in compliance with the mandate—"and by paying to Kemper and Histed respectively the respective sums to be allowed to them." As to the manner of reaching the amount allowed, we think the court adopted an improper and wrong basis. In passing on the issue the court said:

"The value of the stock will be fixed at 62½ cents on the dollar for the 15,000 shares, for services to March 31, 1925, and they will be allowed from that time up until the first day of January, 1927, at the rate of $75,000 a year."

The way in which the 15,000 shares came to be considered will appear from our former opinion. Under the plan of reorganization approved March 24, 1925, Kemper and Histed were to take that for their services and the remaining 20,000 issued shares were to be sold for $62.50 per share. The 15,000 shares at $62.50 per share amounted to $937,500, and $75,000 per annum for the remaining one year and nine months covered by their serv-

ices brought the total to the amount fixed by the court. We said when the case was here before that under the facts the value of the shares was wholly problematical. That has always been the opinion of the court below, as shown by the record. It was not a proper guide in arriving at the value of the services and made the total sum greatly in excess of an allowance of $75,000 per annum for the whole time.

We will later express our views as to the allowances that should be made. We now take up the grounds of the criticisms which counsel think should have some bearing on the subject.

1. In our opinion in the first appeal we referred to the fact that claims against the railroad contracted by a company which was predecessor of the company for which Mr. Kemper was appointed had been presented in the receivership proceedings of the company that contracted them, and were to be paid on the reorganization of the prior company, but were left unpaid. They were a cloud on the title of the successor company of which Mr. Kemper was receiver. Some of them were for construction work and material in making extensions of the road which the reorganized company took over. Three of these claims were purchased by Mr. Kemper on February 10, 1917, at a public bankruptcy sale, for $350,503, on an upset price of $350,-000. At that time Mr. Kemper was not receiver and had no thought that he ever would be. Before that purchase he had opened negotiations with the Carnegie Steel Company to purchase its claim for track steel that had been furnished to the predecessor company, and in January, 1917, he purchased it for $115,000, the claim as reduced and put in judgment being $250,000. The bankruptcy sale was in Kansas City, Kansas, and Mr. Kemper had Mr. P. W. Goebel, who was head of the Commercial National Bank there, make the bid and purchase of the claims first mentioned in his name, but Mr. Kemper paid the purchase price for all of these claims. Later Mr. Goebel assigned the certificate of purchase of the three claims to Mr. Kemper. He was advised by counsel that these claims affected the title to the whole of the railway property, that some, if not all, of them had been declared prior in lien to the mortgage on the property of the predecessor company, else he would not have purchased them. He explained in his testimony the reasons for his purchase: The Commerce Trust Company of Kansas City, of which Mr. Kemper was president, was a large creditor of the road, he himself owned a considerable amount

of the Gold Notes, a number of his friends, including Mr. Goebel, owned Gold Notes, some of whom had purchased them at his earnest solicitation; and he purchased the claims in protection of the interests of all of them and so advised Mr. Goebel at the time. Thereafter in November, 1917, Mr. Kemper as receiver, having been appointed on April 16, 1917, petitioned the court for authority to issue to P. W. Goebel $850,000 face value receiver's certificates in settlement with him for the claims Goebel had bought at the bankruptcy sale with Mr. Kemper's money, it being represented in the petition that a contract to that effect had been or could be made with Goebel. And in May, 1918, a like petition was made to the court to issue $250,000 face value receiver's certificates in purchase of the Carnegie Steel Company claim. Both petitions were granted. As to these transactions Mr. Kemper testified that soon after he was appointed receiver he suggested to Mr. Goebel, inasmuch as the claims he had purchased were purchased for the protection of the Gold Note owners, it would be advisable for him to try to sell them to the Gold Note Holders Committee. Mr. Goebel went to New York for that purpose and was advised by the chairman of the committee that it was not in a position to buy the claims. Later Mr. Goebel went before the committee in New York for the same purpose and while there a plan was worked out by which the committee recommended that the receiver ask the court's permission to purchase the three claims bought by Goebel with $850,000 in receiver's certificates and the Carnegie claim with $250,000 in certificates and pursuant to that the receiver petitioned the court. The claims were thus taken up. They were assigned to the Orient Railway Company and Mr. Kemper retained the $1,100,000 in certificates, less $25,000 which he gave to Mr. Goebel for his services. Mr. Kemper testified that the certificates had no market value at that time, that some of them might have been sold for 40 to 50 cents on the dollar. Mr. Flower, who was then chairman of the board and had been president of the Fidelity National Bank & Trust Company of Kansas City, testified that he would not have given anything for the certificates, that they had no value, "there wasn't any problem about it, they didn't have any value at that time." Mr. Kemper continued to hold these certificates until late in 1920, when, having received a loan from the United States of $2,500,000 as a first lien on the railway property, pursuant to order of the court, he took up these and all other certificates that had

been issued prior thereto in settlement of claims and some that were sold to meet the pressing necessities of the road, and with the proceeds reimbursed himself in the amounts that he had paid out for the claims, invested $500,000 of the excess in United States Liberty Bonds, carried the remainder of the proceeds of these certificates in a special account in his own name, reported the transactions covering the purchase of these claims to the court, in March, 1927, and paid over to the present railway company $683,020.95, being the profits on the two transactions plus the interest that he had received thereon. Mr. Histed seems to have known nothing about how Mr. Kemper was handling these transactions until about the time Mr. Kemper made his report and turned the money over to the new company. These facts constitute one, if not the chief, ground of criticism made by appellants. These transactions in their early history it will be observed became complicated. Mr. Kemper had purchased the claims in his individual right for the protection of himself and associates before there was thought of his being appointed receiver. Shortly after he was appointed he attempted through Mr. Goebel to induce the American Note Holders Committee to take them off his hands, but they were not in a position to do so. He had more than $465,000 invested in them. He was a man of wealth and of wide financial and business ability and experience, and all parties in interest desired his appointment as receiver. His explanation of the manner in which he handled the transaction and delayed reporting to the court the true situation is this: He discovered soon after his appointment, indeed must have had some knowledge to that effect beforehand, that it would be difficult to keep the road going, he found that he would have to guarantee payment of bills at times, as he did, that were necessary to its operation. In 1917, when it became necessary to obtain a loan of $320,000, he and a business associate of his guaranteed payment of $185,000 thereof, and induced other acquaintances to furnish the remainder. He personally guaranteed bills for coal that would not be delivered to the road without that assurance, and bills for other material. He had to pay on some of these guarantees, but in the end was reimbursed. He bought two secondhand engines for $40,000 with his own money, guaranteed interline freight bills and paid the railroad's taxes with his own money. He said these items would run into hundreds of thousands of dollars. He paid the rent on offices, the salaries of employees and the

salaries and expenses of employees whom he sent over the road, and was not reimbursed for eight years, when those expenses had run up to about $80,000. And he testified that he retained in his hands the profits and accruing interest on the above transactions to protect him against those liabilities and sudden emergencies that would and did arise demanding expenditures of funds when none were on hand, such as repairs from floods, etc. Mr. Kemper was warned, if he did not stop risking his own personal credit for the road and putting his own money in it, he would be financially broke.

2. Another matter made the subject of severe criticism is, as claimed, that Kemper and Histed and their associates, who paid $1,250,000 to the new company for the 20,000 shares on reorganization, had bought the rights of Gold Note owners before the 35,000 issued shares were offered for subscription to note-owners, under the mandate; and they used these rights in making their subscriptions for those shares—thus enabling them to obtain a greater number of those shares than they could have gotten if they had not purchased those rights. They had been owners of some of the Gold Notes for a long while, even prior to receivership; but it is claimed they bought more after this litigation came on. Counsel for appellants contend this also was a grave breach of trust, that their purchases enured to the benefit of note-owners who held their notes and did not sell them. They tell us in their brief: "When the matter of compensation came on for hearing these appellants tendered and were allowed to file a petition seeking to impress with a trust $3,000,000 of the Gold Notes of the old corporation alleged to have been purchased by Messrs. Kemper and Histed and associates." But the record is almost barren of facts on this subject. It only shows that Mr. Kemper, at the time he was appointed receiver, owned about $100,000 of these notes. It does not show how many he owned at any other time. It does not show how many Mr. Histed owned at any time, or whether he owned any of them. It shows that a committee composed of Mr. Histed and six others subscribed for and were allotted 20,345 shares of the 35,000, pursuant to terms of the mandate; but there is nothing to indicate how many or whether any of them, were for Mr. Kemper or Mr. Histed. It further shows that what Mr. Kemper referred to as the "Western Group" will have a controlling interest in the road under the subscriptions. That is all. Obviously, we can find no basis for this criticism.

[1] 3. Again, it is said there was dereliction in duty when Mr. Histed presented the plan of reorganization of the new company in March, 1925, and asked that the sale be approved—in that it was represented that there would be no substantial cash balance on hand when the accounts of the receiver were closed; whereas in truth it turned out there were several hundred thousand dollars on hand, and that this was a misleading representation, whether negligently or wilfully made. It must be conceded there is more ground for this and the first criticism discussed above than for any of the others. Certainly a proper administration required an earlier report of the facts touching the claims purchased by Mr. Kemper and an accounting for the proceeds when the receiver's certificates were paid, and indeed, a report of the true facts when those certificates were issued for the claims. But we do not doubt that those transactions as they were handled benefited the estate. The subject of balancing the receiver's accounts is a problem involving large fluctuation from day to day, and the representation as to the probable showing was more of a prophecy than a fact, and presumptively was honestly made. We do not think on the facts of the case either should be used as a forfeiture of compensation for services.

[2] 4. There is another criticism. When the appeal in the other case was pending opposing counsel thought they had reached a settlement. It was agreed that Kemper and Histed should have for their services $500,000 in addition to $80,000 that theretofore had been paid them, and that appellants' representatives in the litigation should have for their services $60,000. Checks were issued and delivered to Mr. Kemper for $250,000, to Mr. Histed for $100,000, and for the $60,000 to appellants' representatives. Later when the settlement did not go through all of these amounts were returned to the company, except the $100,000 paid to Mr. Histed, who retained it as a credit on the allowance to be made to him for his services. We think there is no merit in this criticism.

[3] It is so well established that allowances to a receiver and his counsel are largely in the discretion of the court exercising control over them, that it is unnecessary to review at length the authorities on the subject. In the nature of things that court has a fuller and better knowledge than any other court can possibly obtain of the extent and character of the services and of their value to the estate being administered. In Trustees v. Greenough, 105 U. S. 527, 537 (26 L. Ed.

1157) it is said: "The court below should have considerable latitude of discretion on the subject, since it has far better means of knowing what is just and reasonable than an appellate court can have." Circuit Judge Brewer announced the true limitation on the court's discretion in the matter in Central Trust Co. v. Ry. Co. (C. C.) 32 F. 187, 188: It "is not discretionary in the sense that the courts are at liberty to give anything more than a fair and reasonable compensation"; but in that case there was much testimony on both sides by witnesses whose wide experience touching the subject gave to their opinions great weight, while here appellants tendered no evidence on the point. Tardy's Smith on Receivers, 2d Ed., § 624, says, on this subject, each case is a rule unto itself. See also secs. 620 and 636.

In Stuart v. Boulware, 133 U. S. 78, 82, 10 S. Ct. 242, 244 (33 L. Ed. 568), the court said: "The compensation is usually determined according to the circumstances of the particular case, and corresponds with the degree of responsibility and business ability required in the management of the affairs entrusted to him, and the perplexity and difficulty involved in that management. Like all questions of costs in courts of equity, allowances of this kind are largely discretionary, and the action of the court below is treated as presumptively correct."

Here only two witnesses were called, both by appellees, to give an opinion as to the amount of a fair allowance. Each was an officer, and had been for many years, in large banking institutions at Kansas City. One of them was a director of the Chicago & Alton Railroad and vice-president of two holding roads. He had been acquainted with Mr. Kemper for thirty years, and knew a good deal of the difficulties of this particular railroad. He was also acquainted with Mr. Histed and knew his reputation as a lawyer. He said the receivership was of a very unusual nature, and in his opinion an allowance of from $80,000 to $100,000 per year for the services of both the receiver and his counsel would not be out of place. The other witness testified that he had known Mr. Kemper for thirty years and was acquainted with Mr. Histed, that the receivership was an extraordinary case and he regarded the work that Mr. Kemper and Mr. Histed had done as one of the most constructive jobs he had ever known of, and he fixed the fair compensation of the two for their services at from $75,000 to $100,000 per annum. The district judge in passing on the allowance said that a half-dozen times he was faced with

the calamity of stopping operation of the road and he attributed the avoidance of doing so to the extraordinary efforts and resourcefulness of Mr. Kemper and his counsel. During twenty months of the receivership the road was operated by the United States. During that time the receiver and his counsel continued their services. Mr. Kemper added about 100 miles to the part of the road in the Republic of Mexico. He estimated that he made about 25 trips there and he did the things required to prevent forfeiture of subsidies that had been granted, to be represented in bonds of the State of Chihuahua, to the amount of about $2,500,000 at the then rate of exchange for Mexican money. He also made a needed extension of the road for connections in Texas. He and his counsel seem to have been busy much of the time keeping down taxes along the line of some 700 miles on the plea of necessity of keeping the road in operation. Mr. Kemper acted not only as receiver but as superintendent, manager, and, to some extent, banker for the road, and Mr. Histed seems to have rendered substantial help in services additional to those which were strictly of a legal nature. No other conclusion can be drawn than that the task assigned them was most difficult and perplexing. It exacted ability, resourcefulness, constant and patient care to every detail, and at times the personal credit and financial assistance of the receiver, in no small amounts, to keep it going. We venture to say, in railroad receiverships no case can be found approaching it. They reorganized the road after it was sold. During the year following the sale they succeeded in inducing an extension of the Government's loan as a part of the reorganization plan, and at their request and by their efforts the Government agreed to make an additional loan of one million dollars, to be put into the purchase and betterment of the road's run-down equipment. Its cars were in such bad condition connecting carriers would not receive them. These appellants and all other Gold Note owners were permitted by our mandate to avail themselves of those valuable services, and they are insisting here on their right to do so to the fullest extent. As we said in our former opinion, and say now, the receiver and his counsel are entitled to be well paid for the services they rendered.

[4] The amount allowed by the court is in excess of $100,000 per annum for both the receiver and his counsel. We are constrained to the conclusion that this is excessive. So believing, it may avoid further litigation if

we now determine what in our judgment is a fair and reasonable compensation to each. In making our estimate we may overlook and omit from consideration facts that might weigh either way. We cannot know all of the details. At best the matter is not one for exact determination. But it is our best judgment that the receiver should be allowed $40,000 per annum for his services for the whole time served, and that his counsel should be allowed $35,000 per annum for the time served. These amounts are in accord with the views of the District Judge when he gave consideration to the allowance on a per annum basis. It appears that the District Court found that there were some items of payment or charges to be made against the allowance to the receiver's counsel, including the $100,000 which he holds on account, possibly against the allowance to the receiver also. We leave those deductions to the court below. The receiver and his counsel should be allowed interest at the rate of 6 per cent. per annum on the balances found due them from and after their services cease. Costs on this appeal will be taxed against appellees, Kemper and Histed. The case will be remanded with direction to fix allowances to Kemper and Histed in accordance with the views herein expressed.

Reversed.

KENYON, Circuit Judge (concurring). I agree with the statement in the opinion that "the receiver and his counsel are entitled to be well paid for the services they rendered." While the receiver and his counsel are entitled to be well paid, there is no reason why they should be overpaid. It seems to me there has been a growing tendency in the courts to allow fees to receivers and their counsel far beyond the standards of compensation for similar services where no receivership existed. There is no particular divinity surrounding a receivership and no magic in the appellation "receiver" that changes ordinary and usual services into something of exaggerated value. In the recent case of In re Abraham S. Gilbert, 48 S. Ct. 309, 72 L. Ed. —— (opinion filed March 19, 1928) the Supreme Court of the United States said regarding allowances to Gilbert as master in a number of cases known as the New York Gas Cases in the District Court for the Southern District of New York: "We were desirous of making it clear by our action that the judges of the courts, in fixing allowances for services to court officers, should be most careful, and that vicarious generosity in such a matter could receive no countenance." While I concur in the re-

versal of the order allowing fees to the receiver and his attorney on the ground that the sum allowed was unreasonable, I am of the opinion that the amounts suggested by the court of $40,000 per year for the receiver, and $35,000 per year for his attorney, are too high, and I am unable to agree with the suggestion that these sums would be reasonable compensation, although they are of course much nearer it than the amounts allowed by the trial court.